No. 93,643

STATE OF KANSAS, *Appellee*, v. TIARA JONES, *Appellant*.

(151 P.3d 22)

Opinion filed February 9, 2007.

*Korey A. Kaul,* of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Constance M. Alvey,* assistant district attorney, argued the cause, and *Jerome A. Gorman,* district attorney, and *Phill Kline,* attorney general, were with her on the brief for appellee.

The opinion was delivered by

LUCKERT, J.: Defendant Tiara Jones was convicted of one count of first-degree premeditated murder and one count of second-degree intentional murder. Jones now appeals, attacking his convictions because the trial court refused to: (1) suppress his inculpatory statements to law enforcement officers, (2) excuse a juror who reported contact with the defendant's family during the trial, and (3) instruct on reckless second-degree murder. Jones also attacks his controlling hard 50 life sentence, arguing the hard 50 sentencing provisions are unconstitutional and the trial court erred in imposing the sentence. We reject his arguments and affirm his convictions and sentence.

## FACTS

On August 22, 2002, police found roommates Stephanie Childs and James Brown dead inside Childs' apartment. Brown was lying on a bed, and his wrists and ankles were tied behind his back with an electrical cord. Both Childs and Brown had been shot in the head. Although Jones was interviewed during the initial investigation, he was not initially a prime suspect. In fact, the State prosecuted a former roommate of Childs, Dion Walker, for the murders. Walker's case proceeded to trial in April 2003 with Walker maintaining his innocence.

A few days after Walker's trial began, a biology technician at the Kansas Bureau of Investigation notified Kansas City, Kansas, Detective Greg Lawson that the DNA evidence on the electrical cord used to tie up Brown matched Jones' DNA. The detective notified Walker's defense counsel of the new evidence. Later that day, Walker's defense counsel told Detective Lawson that he would be meeting with Jones to discuss Jones' upcoming testimony in Walker's trial. At that time, the detective planned to conduct a follow-up interview.

According to testimony at the suppression hearing, the district attorney's office sent two investigators to Jones' mother's house, where they found Jones. Investigator Garrett testified that he showed Jones' mother his badge and that they explained the need to take Jones down to the courthouse to go over his statement. The

investigators told Jones he could drive himself and follow them to the courthouse or, if he did not have a vehicle, they would provide the transportation. Jones rode with them to the district attorney's office.

Upon his arrival at the district attorney's office, Jones waited for a period of time in the reception area and was then led to the conference room where Detectives Lawson and William Lee Howard, Jr., explained that they wanted to "go over [Jones'] statement that he had provided earlier, the taped statement, and make sure that everything was still the same as it was at the time [the officers] had talked to him originally." The detectives told Jones that this meeting was voluntary, and they went over his initial statement line by line. Jones was not *Mirandized* at this point. The detectives eventually informed Jones that his DNA was discovered on the electrical cord, and they needed to know if there was a logical explanation for its presence. Detective Lawson began asking Jones what items he might have used in the house or what areas he might have visited, knowing that Jones had professed to having had a sexual relationship with Childs. The detectives knew that the cord came off a bathtub spa in the bathroom, but they did not reveal that detail to Jones.

Jones had no explanation for the presence of his DNA on the electrical cord. According to Lawson, he told Jones that, if there was something they needed to talk about, "this would be the time to do it before you testify" and "if you're involved or whatever, we need to talk about this." Jones then told the officers that he tied Brown up but did not shoot him. Detective Lawson testified that he stopped the interview, advised Jones that they were now talking to him as a suspect, told Jones he did not have to talk any further, and verbally advised Jones of his *Miranda* rights. Jones indicated that he wanted to talk and was adamant that he did not shoot Brown. Shortly thereafter, within approximately 30 minutes, Jones was placed in handcuffs and taken across the street to the police department.

Before being interrogated at the police department, Jones waived his *Miranda* rights by signing the waiver form. This statement was videotaped. Detective Lawson testified that the officers

believed, based on the evidence, that there had been two perpetrators; thus, they wanted to know who was present with Jones at the crime scene. At the police department, Jones looked at some photographs and initially identified the shooter as a man who police knew had been killed some months prior to the incident involving the murders of Childs and Brown. When confronted with this fact, Jones gave another name as his accomplice.

After investigating this lead, the detectives determined this, too, was a false lead and, in fact, was a false name. Upon making this determination, officers brought Jones into the police department for a second videotaped interview. After again *Mirandizing* Jones, the officers confronted him with the results of their investigation. Eventually, Jones named Marcus Kyea as his accomplice. Kyea corroborated Jones' statement that Jones and Kyea were the two perpetrators involved in the murders. According to Kyea, Jones was the shooter. Kyea took officers to the location where the murder weapon was hidden. Officers found the gun in a heavily wooded area near Kyea's residence.

The case against Walker was subsequently dismissed and charges were brought against Jones. At trial, Kyea testified that Jones was having trouble with someone breaking into his apartment and asked Kyea to get him a gun. Kyea obtained a pump-action, "sawed-off" shotgun. On the night of the incident, Jones and Kyea drove around, drinking beer and smoking marijuana. They returned briefly to Jones' apartment and then walked down the street to Childs' apartment. Jones knocked on the door, and Childs let the two men into her apartment, where Brown was sitting on the couch. According to Kyea, Childs and Jones began arguing when Childs denied knowing anything about the burglary of Jones' apartment. Then, Childs said that Walker was involved.

Kyea testified that he gave the gun to Jones and called Walker on the telephone. Walker denied knowing anything about the burglary and hung up the phone. Jones also tried to call Walker, but Walker repeatedly hung up on him. This angered Jones, who threw and broke the phone. Jones then told everybody to go upstairs. Jones went into one bedroom with Childs, and Kyea went into another bedroom with Brown. About 5 to 10 minutes later, Jones

came out with Childs and took Brown into one of the bedrooms. Kyea went into the bathroom with Childs and stood in the doorway while Childs sat crying in the bathtub. Kyea testified that he then heard the "pop" of a gunshot. Brown, "hog-tied" and lying on the bed, had been bound with an electrical cord and shot in the back of the head. He did not survive.

Upon hearing the gunshot, Kyea walked into the bedroom and Childs followed. Seeing Brown lying on the bed, Childs screamed and ran downstairs. Kyea testified that he and Jones followed, and Jones and Childs wrestled near the couch. Kyea saw Childs trying to block the gun with her hands as Kyea walked out the front door. Then, Kyea heard another gunshot. Childs received a fatal gunshot wound to her head. Jones proceeded to leave Childs' apartment, and the two men escaped the scene.

Jones was convicted of the first-degree premeditated murder of Childs and the second-degree intentional murder of Brown. With respect to the first-degree murder conviction, the sentencing court found aggravating circumstances justifying the imposition of a hard 50 life sentence existed, in that more than one person was killed and the crime was particularly heinous or atrocious. In addition to the hard 50 life sentence, Jones received a sentence of 195 months for the second-degree murder conviction, to be served concurrent with the life sentence.

### 1. Motion to Suppress

First, Jones argues that the trial court erred in denying his motion to suppress the statements he made to law enforcement officers in the conference room of the Wyandotte County District Attorney's office and all subsequent statements. Jones contends Detectives Lawson and Howard were conducting a custodial interrogation and did not give him *Miranda* warnings. In denying Jones' motion to suppress, the trial court ruled that the detectives' questioning at the district attorney's office did not constitute a custodial interrogation.

During trial, Jones contemporaneously objected to the admission of the statements. Therefore, the issue is properly preserved

for appeal. See *State v. Holmes*, 278 Kan. 603, 610, 102 P.3d 406 (2004).

Standard of Review

In reviewing the trial court's denial of the defendant's motion to suppress statements, this court determines, without reweighing the evidence, whether the facts underlying the trial court's decision were supported by substantial competent evidence. The trial court's legal conclusion drawn from those facts is reviewed de novo. *State v. Rupnick*, 280 Kan. 720, 727, 740, 125 P.3d 541 (2005). The same standard applies to the subset of these cases dealing with the question of whether a person is in custody at the time of an interrogation. *State v. James*, 276 Kan. 737, 751, 79 P.3d 169 (2003).

Substantial evidence is "evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. Stated another way, substantial evidence is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion. [Citation omitted.]" *State v. Luna*, 271 Kan. 573, 574-75, 24 P.3d 125 (2001).

Custodial or Investigatory

The Fifth Amendment to the United States Constitution guarantees the right against self-incrimination, including the right to have a lawyer present during custodial interrogation and the right to remain silent. "[T]o reduce the risk of a coerced confession and to implement the Self-Incrimination Clause" (*Chavez v. Martinez*, 538 U.S. 760, 790, 155 L. Ed. 2d 984, 123 S. Ct. 1994 [2003] [Kennedy, J., concurring in part and dissenting in part]), the United States Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 479, 16 L. Ed. 2d 694, 86 S. Ct. 1602 reh. denied 385 U.S. 890 (1966), concluded that States may not use statements stemming from a custodial interrogation of a defendant unless the State demonstrates the use of procedural safeguards to secure the defendant's privilege against self-incrimination. However, police are not required to administer *Miranda* warnings to everyone whom they question. *Oregon v. Mathiason*, 429 U.S. 492, 495, 50 L. Ed. 2d

714, 97 S. Ct. 711 (1977). Rather, *"Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Mathiason,* 429 U.S. at 495.

The United States Supreme Court has determined that the question of whether the interrogation is custodial must be determined based on an objective standard of how a reasonable person in the suspect's situation would perceive his or her circumstances. The use of the objective standard was clarified in *Berkemer v. McCarty,* 468 U.S. 420, 82 L. Ed. 2d 317, 104 S. Ct. 3138 (1984), which arose when a police officer stopped and questioned a suspected drunk driver and asked him some questions. The officer reached the decision to arrest the driver at the beginning of the traffic stop; he did not, however, indicate this to the driver and did not make the arrest until the driver failed a sobriety test and acknowledged that he had been drinking beer and smoking marijuana. The Court held the traffic stop noncustodial despite the officer's intent to arrest because he had not communicated that intent to the driver. "A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time," the Court explained. 468 U.S. at 442. "[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." 468 U.S. at 442.

This analytical framework was confirmed in *Stansbury v. California,* 511 U.S. 318, 128 L. Ed. 2d 293, 114 S. Ct. 1526 (1994), when the Court explained that "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." 511 U.S. at 323. Courts must examine "all of the circumstances surrounding the interrogation," 511 U.S. at 322, and determine "how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action.'" 511 U.S. at 325 (quoting *Berkemer,* 468 U.S. at 440).

In *Thompson v. Keohane,* 516 U.S. 99, 133 L. Ed. 2d 383, 116 S. Ct. 457 (1995), the Court summarized the custody test:

"Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circum-

stances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve 'the ultimate inquiry': '[was] there a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' [Citation omitted]." 516 U.S. at 112 (quoting *California v. Beheler*, 463 U.S. 1121, 1125, 77 L. Ed. 2d 1275, 103 S. Ct. 3517 [1983]).

A similar analysis has been applied under § 10 of the Kansas Constitution Bill of Rights, which provides the same guarantees as the Fifth Amendment. *State v. Ninci*, 262 Kan. 21, 34, 936 P.2d 1364 (1997). Kansas courts have long recognized the distinction between custodial and investigatory interrogation. *State v. Taylor*, 234 Kan. 401, 405, 673 P.2d 1140 (1983). Custodial interrogation has been described as the questioning (or its functional equivalent) of persons by law enforcement officers, initiated and conducted while such persons are held in legal custody or are otherwise deprived of their freedom of action in any significant way. Investigatory interrogation is the questioning of persons by law enforcement officers in a routine manner in an investigation and where such persons are not in legal custody or deprived of their freedom of action in any significant way. *State v. Price*, 233 Kan. 706, 712, 664 P.2d 869 (1983); see *State v. Jacques*, 270 Kan. 173, 185-86, 14 P.3d 409 (2000).

Although this court has not been as explicit in stating that there are two discrete inquiries essential to the determination of whether an interrogation is custodial as was the United States Supreme Court in *Thompson*, Kansas courts have used the same framework. Thus, our first inquiry is: what were the circumstances surrounding the interrogation? Our standard of review for this prong on the inquiry is whether there is substantial competent evidence to support the trial court's findings regarding the circumstances. The second inquiry is: under the totality of those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave? We review this determination de novo. See *James*, 276 Kan. at 749-50.

In *State v. Deal*, 271 Kan. 483, 23 P.3d 840 (2001), *abrogated on other grounds State v. Anthony*, 282 Kan. 201, 145 P.3d 1

(2006), this court set out the following factors to be considered in analyzing the circumstances of the interrogation:

"(1) when and where the interrogation occurred; (2) how long it lasted; (3) how many police officers were present; (4) what the officers and the defendant said and did; (5) the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door; (6) whether the defendant is being questioned as a suspect or a witness; (7) how the defendant got to the place of questioning, that is, whether he came completely on his own in response to a police request or was escorted by police officers; and (8) what happened after the interrogation-whether the defendant left freely, was detained, or was arrested. The importance of each factor varies from case to case. [Citation omitted.]" 271 Kan. at 497-98.

See *State v. Fritschen*, 247 Kan. 592, 603, 802 P.2d 558 (1990).

This court has never slavishly adhered to these factors in analyzing the issue of whether a particular interrogation is custodial. In fact, it has been stated that these are not "hard and fast factors." Rather, "[e]ach case needs to be analyzed on its own facts. Factors present in one case will not be present in another. Further, listing factors, 'one two three four five,' implies that each factor bears equal weight. However, in differing cases, the importance of each factor varies." *Fritschen*, 247 Kan. at 603. This said, these factors and any others relevant under the circumstances of the case aid in the consideration of the first step of analysis, *i.e.*, determining the circumstances of the interrogation.

In this case, Jones does not contend that the trial court made erroneous findings of fact, that substantial competent evidence does not support the findings regarding the circumstances, or that the findings of fact were insufficient. In fact, the facts stated above are not disputed. Rather, the defendant disputes the conclusion implied by the trial court's finding that the interrogation was not custodial, *i.e.*, that a reasonable person under those circumstances would have felt at liberty to terminate the interrogation and leave.

In support of his position that a reasonable person would have felt restrained, Jones relies heavily on the fact he was under subpoena to testify. In support, Jones cites *State v. Cathey*, 241 Kan. 715, 741 P.2d 738 (1987), *disapproved on other grounds State v. Schoonover*, 281 Kan. 453, 133 P.3d 48 (2006). In *Cathey*, this

court determined that *Miranda* warnings were not required to admit statements given by a witness at an inquisition pursuant to K.S.A. 22-3101, where the witness' presence was compelled under the subpoena power. 241 Kan. at 721-22. The *Cathey* court noted that statutory safeguards provided by K.S.A. 22-3104 (right to counsel and right not to make incriminating statement) were adequate to protect an inquisition witness' constitutional rights. Jones argues that such statutory safeguards are similar to *Miranda* warnings, which were not given to Jones before the officers spoke to him in the district attorney's conference room. Jones' reliance on *Cathey* is not persuasive, however, because the present case in no way deals with inquisitions or the rights of inquisition witnesses.

Despite this, there is some merit to Jones' contention that someone under subpoena might feel his or her liberty was restrained. Although from a technical standpoint a witness would have no obligation to participate in witness preparation because of being under subpoena to testify, it is understandable that a reasonable person who was not familiar with subpoenas might not understand this distinction. This perception could also be influenced by the fact that the two investigators in the district attorney's office who drove Jones to the interview handed him over to police detectives for the interview. A final factor weighing in favor of concluding that a reasonable person would feel restrained is the fact that Jones was arrested immediately after the interview.

However, these factors must be considered in light of the totality of the circumstances, including those factors that do not suggest the interview was custodial. In this case, there are several. *James*, 276 Kan. at 751. First, regarding the subpoena, there is no evidence the officers used the subpoena as a threat or mentioned it to imply Jones must go to the district attorney's office. In fact, Detective Lawson testified at the suppression hearing that he had no knowledge the subpoena had been served on Jones. Furthermore, there was no actual restraint.

Significantly, the detectives told Jones that the interview was voluntary, and Jones told the detectives that he came to the district attorney's office voluntarily. The detectives never told Jones he was a suspect, that he was in custody, or that he was under arrest until

after Jones volunteered incriminating information. In fact, the circumstances of a trial being under way against another suspect would have caused a reasonable person to believe they would be allowed to leave and were being interviewed only to prepare to testify.

Jones was merely a witness at that point. The officers went over Jones' entire initial statement with Jones and then, recognizing there could be a plausible explanation for Jones' DNA being present on the electrical cord, told Jones about the discovery of his DNA on the cord. Having given no explanation for the presence of his DNA on this item, Detective Lawson told Jones that, if there was something they needed to talk about, "this would be the time to do it" before Jones testified in Walker's case. Again, the focus at that point was upon preparation for trial and the potential cross-examination by the defense regarding the DNA.

Jones asserts that, once the detectives learned that Jones' DNA was found on the electrical cord, he became a "suspect" instead of a "witness," regardless of the fact that there might have been some plausible explanation for the presence of his DNA on the cord. In his appellate brief, Jones states: "It is difficult to believe that the officers, knowing that Mr. Jones' DNA was found on the cord and having excluded any legitimate explanation for its presence, would have let Mr. Jones walk out the door."

However, being a suspect does not make an interrogation custodial. This conclusion was reached in *Beckwith v. United States*, 425 U.S. 341, 48 L. Ed. 2d 1, 96 S. Ct. 1612 (1976), wherein the Court concluded that the failure to give *Miranda* warnings did not render inadmissible statements made by the defendant to Internal Revenue Service agents during a noncustodial interview. The petitioner argued he should have been advised of his rights under *Miranda* because his tax liability was under scrutiny and he was under investigation. The Court concluded this argument ignored completely that *Miranda* was grounded squarely in the Court's explicit and detailed assessment of in-custody interrogations and that the holding was a narrow one—the admissibility of statements obtained from individuals subjected to custodial police interrogations. 425 U.S. at 346. Extension of the *Miranda* requirements to

every case where a defendant was a suspect "would cut (the) Court's holding in that case completely loose from its own explicitly stated rationale." 425 U.S. at 345. Rather, the Court concluded, an interview is not custodial

"simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was that sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited." *Oregon v. Mathiason*, 429 U.S. at 495.

In weighing these various circumstances, parallels can be drawn to the circumstances in *State v. Ninci*, 262 Kan. 21, 936 P.2d 1364 (1997), where this court upheld the trial court's finding that the first hour of the defendant's interview was noncustodial. In *Ninci*, two officers interrogated the defendant in an interview room at the police station. The entire interview lasted approximately 3 and ½ hours, but the un-*Mirandized* portion of the interview only lasted 1 hour. Although two police officers were present, each one left the room several times for various reasons. The discussion between the officers and Ninci during the first hour of the interview was amiable. As noted by the *Ninci* court, the officers asked Ninci if he had any plans for the remainder of the evening, which indicated that the interview could have been postponed to a more convenient time for him, if necessary. 262 Kan. at 37.

In addition, while the officers stated that they were trying to clear Ninci as a "suspect" and that they would "cut [him] loose" later in the evening, they also thanked Ninci for voluntarily coming in and helping them with the investigation. At one point, the officers provided Ninci with a beverage at his request and asked him if he wanted cake. Ninci was not physically restrained in any way. This court observed that the police obviously wanted to question Ninci as a potential suspect but that the officers testified they also wanted to talk to Ninci to find out more about another person whose car was seen at the victim's house the same week as the murder. Ninci voluntarily came to the police station in his own car in response to a police request. 262 Kan. at 37.

One of the officers asked for Ninci's driver's license at the beginning of the interview and did not immediately give the license back to Ninci. However, a few minutes into the interview, the officer placed the license on the table within Ninci's reach. When Ninci asked to have his license back after an hour had passed, the officer readily handed it back to him. When the interview ended, Ninci was arrested because he had admitted to being involved in the victim's murder. 262 Kan. at 37.

This court held there was substantial evidence to support the trial court's findings. Concluding that a reasonable person would have felt free to leave under the same circumstances, at least up until the time Ninci started confessing to the crime, the court held that Ninci was not in custody during the first hour of the police interrogation, and this first hour of the interview constituted only an investigatory interrogation, not a custodial interrogation. Thus, the officers' failure to provide Ninci with *Miranda* warnings during the first hour of the interview did not require the suppression of his statements taken during that time period. 262 Kan. at 38 (citing *State v. Haddock*, 257 Kan. 964, 897 P.2d 152 [1995], *abrogated on other grounds by State v. James*, 276 Kan. 737, 79 P.3d 169 [2003]; *State v. Fritschen*, 247 Kan. 592, 802 P.2d 558 [1990]; *State v. Jones*, 246 Kan. 214, 787 P.2d 726 [1990]); see also *State v. Jacques*, 270 Kan. 173 (first interview at police station was noncustodial; defendant was free to go, interview took place in interrogation room, officers drove defendant to police station, defendant left freely after interview, interview lasted about 2 and 1/2 hours, and officers testified that Jacques was not suspect when interviewed the first time and that he was merely being questioned as possible witness); *State v. Heath*, 264 Kan. 557, 957 P.2d 449 (1998) (no custodial interrogation where defendant went voluntarily to police station to be interviewed and waited unrestrained in waiting room prior to interview); *State v. Gooden*, 22 Kan. App. 2d 271, 915 P.2d 169, *rev. denied* 260 Kan. 998 (1996) (investigating officer questioned defendant in defendant's home, officer refused to allow defendant to go outside, officer ordered defendant to sit down when he got up, and officer pulled a weapon; interview was not custodial but consensual).

Similarly, in one of the more recent applications of *Miranda* by the United States Supreme Court, the Court noted as important factors the voluntariness of the witness' presence, the focus upon another suspect, and the lack of coercive threats or suggestions. *Yarborough v. Alvarado*, 541 U.S. 652, 158 L. Ed. 2d 938, 124 S. Ct. 2140 (2004), involved the Court's review of a state court determination that a interview was not custodial. The Supreme Court noted there were "objective facts [that] are consistent with an interrogation environment in which a reasonable person would have felt free to terminate the interview and leave," 541 U.S. at 664-65, including: the police did not transport the 17-year-old suspect to the station or require him to appear at a particular time; the police did not threaten the suspect or suggest he would be placed under arrest; the suspect's parents remained in the lobby during the interview, suggesting that the interview would be brief; the suspect and his parents were told the interview was not going to be long; during the interview, the police focused upon another person's activities rather than the suspect's; the police did not pressure the suspect with the threat of arrest and prosecution; the suspect was offered a break; and, at the end of the interview, the suspect went home. However, the Court also noted: "Other facts point in the opposite direction." 541 U.S. at 665. Those facts included: the interview occurred at the police station, the interview lasted 2 hours; the suspect was not told he was free to leave; the suspect was brought to the station by his legal guardians, making the extent of his control over his ability to leave unclear; and his guardians were not allowed at the interview. After listing the factors on each side and discussing its standard of review in a habeas corpus case, the Court concluded: "These differing indications lead us to hold that the state court's application of our custody standard was reasonable. . . . The custody test is general, and the state court's application of our law fits within the matrix of our prior decisions." 541 U.S. at 665.

In this case, although there is evidence consistent with factors supporting the conclusion that a reasonable person would not feel free to leave, there is also substantial competent evidence consistent with factors supporting the conclusion that a reasonable per-

son would feel free to leave the interrogation. Thus, the trial court's determination that the interview was noncustodial fits within the matrix of decisions of the United States Supreme Court and this court.

Our de novo review of the circumstances leads us to conclude a reasonable person in the same circumstances as Jones would have felt free to leave. Walker remained the focus of the investigation and, in fact, was on trial. The police believed there could be a noncriminal, plausible explanation for the presence of the DNA and, as such, handled the interview as preparation for trial, conducting it at the district attorney's office and reviewing Jones' previous statement. Jones was told the interview was voluntary, he was never physically restrained, nor was he threatened.

As a matter of law, based upon the evidence before the trial court, we conclude the interview merely constituted an investigatory interrogation, not a custodial interrogation. There was no requirement for *Miranda* warnings to be issued. The trial court did not err by denying Jones' motion to suppress his pre-*Miranda* statements.

## Missouri v. Seibert

Jones further argues that, although the officers immediately informed Jones of his *Miranda* rights upon hearing his incriminating statement, those subsequent warnings failed to remove the "taint" of the pre-*Miranda* statements with respect to his post-*Miranda* statements. To support this argument, Jones cites the recent case of *Missouri v. Seibert*, 542 U.S. 600, 159 L. Ed. 2d 643, 124 S. Ct. 2601 (2004). In *Seibert*, the Court condemned a two-step interrogation technique in which police deliberately failed to provide *Miranda* warnings in the hope that the suspect's unwarned statements would cause her to give more information in a later interview conducted after *Miranda* warnings were given. 542 U.S. at 609-10, 617. Officers had intentionally violated *Miranda* by questioning Seibert at the police station about a murder without first advising her of her rights. 542 U.S. at 604-05. After Seibert made an incriminating statement, the police gave her a 20-minute coffee break. When the interrogation resumed, they advised her of her

*Miranda* rights and obtained her waiver of them. An officer then confronted Seibert with her earlier admission and elicited a confession that was used to convict her. The Court held that the question-first technique undercuts *Miranda's* goal of reducing the chances of admitting a coerced confession, and under the facts, the warnings were unlikely to serve their intended purpose. The Court, therefore, concluded the postwarning statements were inadmissible. 542 U.S. at 617.

The *Seibert* Court distinguished its earlier decision in *Oregon v. Elstad*, 470 U.S. 298, 84 L. Ed. 2d 222, 105 S. Ct. 1285 (1985), which held a suspect who has answered inadvertently unwarned, uncoercive questions may validly waive his rights and provide an admissible statement after being warned. In *Elstad*, the defendant had made an initial statement in his home, was taken to the police station, given *Miranda* warnings, and then admitted his involvement in a crime. 470 U.S. at 301. In contrasting between *Elstad* and the situation in *Seibert*, the *Seibert* Court listed several facts that bear on whether *Miranda* warnings delivered midquestioning can be effective in assuring that a statement is voluntary: "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Seibert*, 542 U.S. at 615. Because a reasonable person in Elstad's position could have seen the police station questioning as a new and distinct experience from the earlier, unwarned questioning in his home, the station house *Miranda* warnings could have been viewed "as presenting a genuine choice whether to follow up on the earlier admission." 542 U.S. at 615-16.

In the present case, *Seibert* is distinguishable in that Jones was not in police custody at the time that the detectives questioned him in the conference room. Regardless, even if *Seibert* applied, there would be no reason to find Jones' post-*Miranda* statements inadmissible. Although the same officers conducted the post-*Miranda* interrogations of Jones, those interrogations were conducted at the police station, *i.e.*, a different location than the initial ques-

tioning. At the station, Jones was aware that he was now being questioned as a suspect. The questions became more detailed in that the officers wanted to know the identity of Jones' accomplice and the details of the crimes. A reasonable person could have seen the police station questioning as a new and distinct experience from the earlier questioning in the conference room at the district attorney's office.

We conclude the trial court did not err in admitting either Jones' pre-or post-*Miranda* statements to police made after the trial against another suspect had begun.

### 2. Failure to Excuse a Juror

Next, Jones argues the trial court erred in failing to excuse a particular juror, who will be referred to as Juror J., and substitute an alternate juror due to Juror J.'s alleged "fear" of the defendant's family. This contention lacks merit.

Standard of Review

K.S.A. 2005 Supp. 22-3412(c) provides that a trial court may impanel alternate jurors in the event that "in the judge's discretion, the judge believes it advisable to have such jurors available to replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable to perform their duties."

Consistent with the language of the statute, the trial court's decision whether to substitute one juror with an alternate is reviewed for abuse of discretion. *State v. Minski*, 252 Kan. 806, 814, 850 P.2d 809 (1993). "The defendant has a burden of showing substantial prejudice before an appellate court will find an abuse of discretion by the trial court." *State v. Stallings*, 246 Kan. 642, 646, 792 P.2d 1013 (1990).

Factual Background

Initially, there were two alternate jurors in this case. On the first day of trial, the court admonished the jury regarding reporting any problems that needed to be brought to the court's attention. On the second day of trial, Juror J. informed the bailiff that someone from the defendant's family approached her and attempted to talk to her. When brought to the trial court's attention, the judge asked

the juror on the record, out of the presence of the other jurors, what happened. Juror J. indicated that when she returned from the lunch break, "a few guys were sitting outside and they just kind of stared me down, stuff like that." During another break, the young men asked the juror her name. Juror J. told the judge that she felt "uncomfortable with that."

The trial judge asked defense counsel to speak to the young men about refraining from this type of conduct. Defense counsel advised the court that he spoke to the defendant's family and told them not to have any contact with any of the jurors. The trial judge asked counsel if there was anything else they wanted to say. Counsel replied that there was not. The trial judge concluded the hearing by stating: "Well, let's hope [that] takes care of it," and the trial was adjourned for the day.

The next day, before commencing the trial, attorney Jerome Gorman, who was an assistant district attorney at that time and was not assigned to Jones' case, informed the court that he had spoken with Juror J.'s father, who was a friend of his. Gorman, initially not knowing that the trial court had already dealt with the matter, had suggested that Juror J. give him a call. Before the juror called him, Gorman spoke with the prosecutor in Jones' case and determined it would be best if Gorman did not speak with the juror. Therefore, when Juror J. called him, Gorman merely spoke to her for about 30 seconds, telling her that she should follow the trial court's instructions.

After discussing with the court concerns about possible bias, defense counsel requested that the trial court excuse Juror J. from service. The trial court denied Jones' request, finding that the situation was handled appropriately the previous afternoon. The court essentially sensed that the juror completely followed the court's admonition by informing the court regarding the young men's behavior. The court found that the juror had not been compromised and that she would be fair and impartial.

Jones compares the trial court's refusal to excuse Juror J. with the court's decision to excuse Juror M., another juror in this case. After sitting through the first afternoon of testimony at the trial, Juror M. realized that she knew the defendant's mother from work.

She reported to the bailiff that it would be difficult for her to continue serving on the jury, particularly if a guilty verdict was reached. The trial court questioned Juror M. on the record, out of the presence of the other jurors, about the purported personal difficulty. She explained to the court: "Like maybe after the trial's over if I see her, you know, if he's convicted, she might look at me like she was one of the jurors, you know, that was on the trial of my son and I don't want to be put in that position. Because after the trial, you know, I have to get on with my life." Juror M. expressed concern about personal distress. However, the trial judge asked if Juror M. could be fair and impartial, and she answered in the affirmative. After hearing her testimony, over the defendant's objection, the court excused Juror M. under the circumstances.

Analysis

The situations involving Juror M. and Juror J. are completely unrelated. Jones correctly observes that this court has acknowledged that the trial court may substitute a juror for reasonable cause. *State v. Haislip*, 237 Kan. 461, 469, 701 P.2d 909 (1985). Jones argues that reasonable cause existed in this case because of Juror J.'s feeling uncomfortable or afraid after being approached by the defendant's family members. According to the transcript, however, the juror never told the trial court that she was afraid.

Jones contends that this situation is similar to *United States v. Davis*, 177 F.3d 552 (6th Cir. 1999), where an alternate juror reported that he felt intimidated. The juror reported to the court he was a businessman who had done business with some of the defendants, witnesses, and their families. He informed the court he feared for his own safety and that of his business. The juror admitted that he had conveyed these fears to other jurors. The trial court dismissed the alternate juror but did not investigate whether any of the sitting jurors were biased by the situation. 177 F.3d at 556.

The Sixth Circuit Court of Appeals observed that where "a colorable claim of extraneous influence has been raised, . . . a 'Remmer hearing' must be held to afford the defendant an opportunity to establish actual bias." 177 F.3d at 557 (citing *Remmer v. United*

*States*, 347 U.S. 227, 98 L. Ed. 654, 74 S. Ct. 450 [1954]). Because the trial court failed to hold a hearing to inquire about any bias felt by the remaining jurors, the federal appellate court reversed the defendant's conviction and remanded for a new trial, noting that the failure to conduct a hearing is an abuse of discretion. 177 F.3d at 557.

Jones argues that the same situation exists here and that Juror J. should have been specifically questioned about any bias. This is not persuasive. Here, an inquiry was made of the juror. The trial court questioned Juror J. about the reported contact between her and the defendant's family. The court acknowledged that the juror was 18 years old and "was trying to do the right thing." Initially, the court asked the juror whether it was correct that she reported essentially feeling intimidated by those individuals, and Juror J. said, "Yes." This led to the court's further questioning her about what happened. The defendant did not object to the questions asked or seek to ask additional questions.

The next morning, the trial court heard arguments by counsel regarding the situation. The defendant asked for the juror's removal but did not ask for an additional hearing. The prosecutor noted that it had not been established that the juror was biased because of the contact.

As the court held in *Davis*, "the defendant bears the burden of proving actual juror bias, and no presumption of prejudice arises merely from the fact that improper contact occurred." 177 F.3d at 557. The *Davis* court cited case law relying upon the United State Supreme Court's decision in *Smith v. Phillips*, 455 U.S. 209, 71 L. Ed. 2d 78, 102 S. Ct. 940 (1982), in which the Court stated:

"[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as *voir dire* and protective instruction from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." 455 U.S. at 217.

In this case, the trial court did determine the effect of the contact, concluding:

"I did not feel any sense from talking to [the juror] yesterday or observing her demeanor or anything of that nature that she felt intimidated, although I probably have used that word. I think that she was just trying to say this has happened, somebody in authority needs to know what has happened and I'm trying to do the right thing."

The trial court noted that Juror J. used the word "uncomfortable." In concluding the hearing, the trial judge stated: "[M]y sense at this point is that she's not been compromised and that she could still be a fair and impartial juror." In addition, it appears that there was no further contact between the young men and Juror J.

There was no evidence that Juror J. was unable to reach a decision or that she could not be fair and impartial. Further, Jones fails to show, or even to argue, that he was prejudiced by the trial court's decision to allow Juror J. to serve on the jury. The defendant did not meet his burden of establishing substantial prejudice, and there is no reason to conclude that the trial court abused its discretion.

### 3. Jury Instruction Regarding Reckless Second-Degree Murder

Jones next contends that the trial court erred in refusing to instruct the jury regarding unintentional but reckless second-degree murder, a lesser included offense of first-degree premeditated murder, as the crime related to the death of Stephanie Childs. This contention lacks merit.

At the jury instructions conference, Jones requested an instruction on the lesser included offense. The district court agreed to give the reckless second-degree murder instruction for the crime related to the death of James Brown but refused to give the instruction in relation to the death of Childs.

Our standard of review of a refusal to instruct on a lesser included offense is well established. A trial court must instruct the jury on a lesser included offense "where there is some evidence which would reasonably justify a conviction" of the lesser offense. K.S.A. 2005 Supp. 22-3414(3). "If the defendant requests the instructions, the trial court has a duty to instruct the jury regarding

all lesser included crimes that are established by the evidence, regardless of whether the evidence is weak or inconclusive." *State v. Hoge*, 276 Kan. 801, 805, 80 P.3d 52 (2003). On review, this court views the evidence in the light most favorable to the defendant. *State v. Jones*, 279 Kan. 395, 109 P.3d 1158 (2005). An instruction on a lesser included offense is not required if the jury could not reasonably convict the defendant of the lesser included offense based on the evidence presented. *Hoge*, 276 Kan. at 805.

To prove reckless second-degree murder, the State must show that a human being was killed "unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life." K.S.A. 2005 Supp. 21-3402(b).

The trial court in the present case instructed the jury on voluntary intoxication as a defense to the charges of first-degree premeditated murder and second-degree intentional murder. The instruction, congruent with PIK Crim. 3d 54.12-A, stated:

"Voluntary intoxication may be a defense to the charges of Murder in the First Degree—Premeditated where the evidence indicates that such intoxication impaired a defendant's mental faculties to the extent that he was incapable of forming the necessary intent, to-wit: the intentional and premeditated killing of Stephanie Childs as alleged in Count I and the intentional and premeditated killing of James Brown as alleged in Count II.

"Voluntary intoxication may be a defense to the lesser included charges of Murder in the Second Degree—Intentional where the evidence indicates that such intoxication impaired a defendant's mental faculties to the extent that he was incapable of forming the necessary intent, to-wit: the intentional killing of Stephanie Childs as alleged in Count I and the intentional killing of James Brown as alleged in Count II."

Jones argues that, in light of the fact that the trial court gave the voluntary intoxication instruction, the court should also have instructed the jury regarding reckless second-degree murder as to the death of Childs. Jones contends that if the jury had believed he was so intoxicated that he could not form the specific intent to kill Childs, only a general intent would have remained. He argues that, under those circumstances, the highest level of homicide of which he could have been convicted would have been unintentional or reckless second-degree murder.

Although voluntary intoxication is not a defense to general intent crimes, a voluntary intoxication defense may be used to negate the intent element of specific intent crimes. *State v. Sterling*, 235 Kan. 526, 528, 680 P.2d 301 (1984); see also K.S.A. 21-3208(2) (intoxication); *State v. Ludlow*, 256 Kan. 139, 144-45, 883 P.2d 1144 (1994). This court has indicated, however, that even when it is appropriate to give a voluntary intoxication instruction in a prosecution for first-degree premeditated murder or second-degree intentional murder, evidence of voluntary intoxication alone does not justify an instruction on unintentional but reckless second-degree murder.

In *State v. Drennan*, 278 Kan. 704, 101 P.3d 1218 (2004), the defendant was convicted of the first-degree murder of his girlfriend. In addition to giving a first-degree murder instruction, the trial court instructed the jury regarding voluntary intoxication. One of the defendant's arguments on appeal was that the trial court erred in failing to give an instruction on the lesser offense of reckless second-degree murder. 278 Kan. at 711. The defendant asserted that the jury could have found that he recklessly choked the victim by attempting to restrain her in a too aggressive manner and by keeping her in a "choke hold" too forcefully and too long. 278 Kan. at 715.

This court disagreed, noting that the defendant's argument ignored crucial facts that pointed to intentional rather than reckless behavior. The *Drennan* court also quoted the following from *State v. Jones*, 267 Kan. 627, 984 P.2d 132 (1999), concerning the issue of forming the intent to kill:

" 'What Jones' argument does not take into account is that an intoxicated defendant's being incapable of forming the intent to kill does not transform his or her conduct into conduct so reckless in the circumstances as to manifest extreme indifference to the value of human life. In other words, intoxication can eliminate intent to kill so that the killing is unintentional under the law, but it may not supply the extreme recklessness element of unintentional second-degree murder. Thus, evidence of voluntary intoxication alone will not justify an instruction on reckless second-degree murder as a lesser offense of premeditated first-degree murder.' " *Drennan*, 278 Kan. at 715 (quoting *Jones*, 267 Kan. at 634).

In *Drennan*, the victim was found with an electrical cord around her neck, and her fingers were bruised from trying to pull the cord

away from her neck. The victim was placed in a "choke hold" with such force that the hyoid bone was broken and neck muscles hemorrhaged. She was choked for at least 4 minutes, and blood and oxygen were cut off to the brain. As in *Jones*, the *Drennan* court held the trial court did not err in refusing to give instructions based upon reckless rather than intentional behavior. 278 Kan. at 716; see also *Jones*, 267 Kan. at 633 (concluding that Jones' statement that he did not intend to kill the victim was "insubstantial and insufficient" to support theory of reckless second-degree murder when "Jones used his hands to grip her neck hard enough to break pliable bone . . . and long enough—4 to 6 minutes—to fatally deprive her of oxygen."); accord *State v. Cavaness*, 278 Kan. 469, 474, 101 P.3d 717 (2004) (voluntary intoxication instruction; no evidence of recklessness; defendant's testimony at most established that victim's death was an unintended consequence of his intentional act of striking victim with baseball bat); *State v. Bailey*, 263 Kan. 685, 691, 952 P.2d 1289 (1998) ("[A] defendant's actions in pointing a gun at someone and pulling the trigger are intentional rather than reckless even if the defendant did not intend to kill the victim."), *abrogated on other grounds by State v. Meeks*, 277 Kan. 609, 88 P.3d 789 (2004); *State v. Pierce*, 260 Kan. 859, 867, 927 P.2d 929 (1996) (no evidence of recklessness; at best the evidence on behalf of defendant suggested he did not intend to kill victim but only defended himself by intentionally shooting victim in leg).

The State argues that there was no evidence to support a reckless second-degree murder instruction with respect to the death of Childs. We agree. After Brown was hog-tied to the bed and shot, Childs ran screaming down the stairs. Jones went after Childs, caught up with her, and wrestled with Childs in the living room. The weapon that was used in this case was a pump-action shotgun that had to be pumped before each shot could be fired. Forensic evidence showed that Childs was shot in the head and that the barrel of the shotgun was located within 1 foot of her head. The evidence pertaining to Childs' death pointed to intentional, not reckless, conduct on the part of Jones. The trial court did not err in refusing to instruct the jury on reckless second-degree murder.

### 4. *Constitutionality of Hard 50*

Next, Jones contends the hard 50 sentencing scheme is unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). Jones takes issue with the fact that, under the Kansas scheme, a jury does not determine the facts that increase the penalty beyond a reasonable doubt. The defendant's contention has no merit.

Jones' arguments have been repeatedly rejected by this court, most recently in *State v. Reed*, 282 Kan. 272, 144 P.3d 677 (2006); *State v. Kirtdoll*, 281 Kan. 1138, 136 P.3d 417 (2006); and *State v. Lawrence*, 281 Kan. 1081, 135 P.3d 1211 (2006). Jones cites no new case law and offers no new arguments. There is no reason to stray from Kansas precedent. Jones' sentencing scheme argument fails.

### 5. *Imposition of Hard 50 Sentence*

Finally, Jones contends that the trial court erred by imposing a hard 50 sentence on his first-degree premeditated murder conviction. He argues that the trial court erred by (1) finding that the crime was committed in a "particularly heinous or atrocious" manner and (2) failing to make any findings on the record regarding the mitigating factors presented by defense counsel at sentencing. Jones' arguments lack merit.

### Heinous, Atrocious, or Cruel Manner

Jones contends that his hard 50 life sentence must be vacated because there is insufficient evidence to support the trial court's finding that Childs' murder was committed in an especially heinous, atrocious, or cruel manner.

Our standard of review is well known:

" 'When a defendant challenges the sufficiency of evidence for establishing the existence of an aggravating circumstance in a hard 50 sentencing proceeding, the standard of review is whether, after a review of all the evidence, viewed in the light most favorable to the prosecution, a rational factfinder could have found the existence of the aggravating circumstance by a preponderance of the evidence.' *State v. Buehler-May*, 279 Kan. 371, Syl. ¶ 12, 110 P.3d 425 (2005)." *State v. Washington*, 280 Kan. 565, 568, 123 P.3d 1265 (2005).

At the sentencing hearing, the trial court found the existence of two aggravating factors associated with Jones' first-degree premeditation conviction. The court stated:

"Number one is that the actions of the defendant here created a risk of death to more than one person, two . . . persons exactly. And, in fact, two people were . . . killed on this particular incident.

"In addition to that, the Court does find that this particular killing was particularly heinous in the sense that Ms. Childs had to have known for a period of time, I don't know exactly how long that period of time would have been, but she had to have known that she was going to be killed based upon the events that had taken place in the house, the fact that Mr. Brown was tied up and then shot in the head, and then the chase through the house and where she was ultimately apprehended and killed so that there was, in fact, a period of time where she knew what her fate was going to be, and the Court finds that . . . is particularly heinous or atrocious."

K.S.A. 2005 Supp. 21-4635(b) provides that, when a defendant is convicted of first-degree premeditated murder for a crime committed after July 1, 1999, the court shall determine whether the defendant shall be required to serve a mandatory hard 50 term. In making such a determination, if the trial court finds that one or more aggravating circumstances exist and are not outweighed by any mitigating factors that exist, the court must impose the hard 50 sentence. K.S.A. 2005 Supp. 21-4635(d).

K.S.A. 2005 Supp. 21-4636(f) describes the relevant aggravating circumstance as follows:

"(f) The defendant committed the crime in an especially heinous, atrocious or cruel manner. A finding that the victim was aware of such victim's fate or had conscious pain and suffering as a result of the physical trauma that resulted in the victim's death is not necessary to find that the manner in which the defendant killed the victim was especially heinous, atrocious or cruel. In making a determination that the crime was committed in an especially heinous, atrocious or cruel manner, any of the following conduct by the defendant may be considered sufficient:

"(1) Prior stalking of or criminal threats to the victim;

"(2) preparation or planning, indicating an intention that the killing was meant to be especially heinous, atrocious or cruel;

"(3) infliction of mental anguish or physical abuse before the victim's death;

"(4) torture of the victim;

"(5) continuous acts of violence begun before or continuing after the killing;

"(6) desecration of the victim's body in a manner indicating a particular depravity of mind, either during or following the killing; or

"(7) any other conduct in the opinion of the court that is especially heinous, atrocious or cruel."

Jones argues that the evidence in this case does not support a finding that any of the first six factors were present and that no exceptional circumstances exist to support the remaining factor, *i.e.*, "any other conduct in the opinion of the court that is especially heinous, atrocious, or cruel." The State responds that evidence supported both the third factor, *i.e.*, "infliction of mental anguish or physical abuse before the victim's death," and the fifth factor, *i.e.*, "continuous acts of violence begun before or continuing after the killing."

This court recently reiterated in *State v. Baker*, 281 Kan. 997, 1019, 135 P.3d 1098 (2006), that "[s]tanding alone, the fact that the victim was killed by gunshots fired by the defendant is generally not sufficient to support a finding that the manner of death was especially heinous, atrocious, or cruel." In *Baker*, this court vacated the defendant's hard 50 sentence where the trial court found the victim's murder was committed in an especially heinous, atrocious, or cruel manner pursuant to K.S.A. 2005 Supp. 21-4636(f)(7). 281 Kan. at 1018. The victim, a paraplegic, was shot in the head, but there was no evidence that the victim was terrorized or knew he was going to die prior to being shot. The trial court erroneously focused on the victim's defenselessness alone. See also, *e.g.*, *State v. Holmes*, 278 Kan. 603, 608, 638-39, 102 P.3d 406 (2004) (reversing hard 40 sentence because firing a single shot through victim's heart was not especially heinous, atrocious, or cruel); *State v. Cook*, 259 Kan. 370, 401-03, 913 P.2d 97 (1996) (reversing hard 40 sentence because defendant's act of shooting victim twice was not especially heinous, atrocious, or cruel); *State v. Reed*, 256 Kan. 547, 562-63, 886 P.2d 854 (1994) (concluding that shooting victim in the head was not especially heinous, atrocious, or cruel and other testimony supporting the finding amounted to conjecture and speculation, but upholding hard 40 sentence based on another aggravating factor).

Jones argues that this case is similar to *State v. Flournoy*, 272 Kan. 784, 36 P.3d 273 (2001). There, the defendant walked into the living room with a gun and shot his grandmother, despite his girlfriend telling him, "[D]on't do that, put that up." The girlfriend then ran into the kitchen and told the defendant to stop. Flournoy said, "I have to put her out of her misery," and fired again. A forensic pathologist testified that the victim suffered five gunshot wounds, all of which most likely occurred in less than 1 minute. 272 Kan. at 794. Observing that the victim was neither chased down nor forced to lie on the floor awaiting death, this court held that the evidence did not support a finding that the murder was committed in an especially heinous, atrocious, or cruel manner. 272 Kan. at 794.

*Flournoy* followed the general rule, but this court has permitted exceptions to that rule based on particular facts. In *State v. Alford*, 257 Kan. 830, 838, 896 P.2d 1059 (1995), the trial court concluded the murder was heinous, atrocious, or cruel where the defendant chased the victim into the lobby of a restaurant, shot her twice, and forced her back into the kitchen. When the victim attempted to escape, the defendant shot her again, dragged her around the corner of the kitchen, and fired two final shots. 257 Kan. at 838.

In *State v. Brady*, 261 Kan. 109, 123-24, 929 P.2d 132 (1996), *abrogated on other grounds by State v. Vontress*, 266 Kan. 248, 970 P.2d 42 (1998), the victims were forced to lie face down on the floor for 15 minutes not knowing what was going to happen while the defendant paced the room holding a gun before ultimately shooting them both in the head. In both *Alford* and *Brady*, this court upheld the trial court's finding that the murders were committed in a heinous, atrocious, or cruel manner. See also *State v. Washington*, 280 Kan. 565, 123 P.3d 1265 (2005) (murder committed in heinous, atrocious, or cruel manner where defendant shot victim several times, victim attempted to hop away crying out for help, and victim was chased and suffered substantial mental anguish).

Viewing the evidence in the light most favorable to the prosecution, *Alford* and *Brady* are more germane under the facts of this case. After arriving at Childs' apartment with a gun and arguing

with her about who burglarized his apartment, Jones told both victims to go upstairs. Once upstairs, Jones took Childs into a bedroom and shut the door. After 5 or 10 minutes, Jones and Childs came out of the bedroom and Jones took Brown into the bedroom. While Brown was being hog-tied in the bedroom, Childs was in the bathroom with Kyea, crying and pleading for her life. Childs sat in the bathtub, and Kyea stood in the doorway. Although he was not certain, Kyea testified that he might have had the gun again at that time. After about another 5 minutes, Jones came into the bathroom, got the gun from Kyea, returned to the bedroom, and shot Brown. When Kyea went into the bedroom to take a look, Childs followed. When she saw what happened to Brown, Childs screamed and ran down the stairs. Jones chased after her and struggled with her in the living room. Before Jones shot her in the head, Childs was on the floor, screaming and holding her hands up near her face.

Although the shooting occurred in a relatively short period of time, the victim clearly was chased and suffered mental anguish as demonstrated by her cries while being held in the bathroom before she was murdered. Therefore, a preponderance of the evidence supports the trial court's finding that Childs' murder was committed in an especially heinous, atrocious, or cruel manner.

Mitigating Factors

Jones also contends that the trial court erred in failing to make findings regarding the mitigating factors submitted by defense counsel at the sentencing hearing.

This court reviews the trial court's weighing of aggravating and mitigating circumstances for abuse of discretion. *State v. Engelhardt*, 280 Kan. 113, 144, 119 P.3d 1148 (2005).

At sentencing, defense counsel argued that the trial court should consider Jones' age at the time of the crime, Jones' being under the influence of alcohol and drugs, Jones' ultimate cooperation with detectives, and the short amount of time between the two murders. The trial court, however, made no reference or findings concerning any mitigating factors during its pronouncements from the bench.

As previously discussed, in imposing the hard 50 sentence, the trial court found the existence of two aggravating circumstances.

In a hard 50 proceeding, the trial court is to determine whether one or more aggravating circumstances exist beyond a reasonable doubt and whether the existence of such aggravating circumstances is not outweighed by any mitigating circumstances which are found to exist. The court shall designate in writing the statutory aggravating circumstances it found to exist. K.S.A. 2005 Supp. 21-4635(d).

K.S.A. 21-4637 enumerates eight mitigating factors which may be considered in a hard 50 proceeding, but this list is noninclusive:

"(1) The defendant has no significant history of prior criminal activity.

"(2) The crime was committed while the defendant was under the influence of extreme mental or emotional disturbances.

"(3) The victim was a participant in or consented to the defendant's conduct.

"(4) The defendant was an accomplice in the crime committed by another person, and the defendant's participation was relatively minor.

"(5) The defendant acted under extreme distress or under the substantial domination of another person.

"(6) The capacity of the defendant to appreciate the criminality of the defendant's conduct or to conform the defendant's conduct or to conform the defendant's conduct to the requirements of law was substantially impaired.

"(7) The age of the defendant at the time of the crime.

"(8) At the time of the crime, the defendant was suffering from post-traumatic stress syndrome caused by violence or abuse by the victim."

Jones contends that, because the trial court did not make findings concerning the mitigating factors presented at his sentencing hearing, any appellate argument and appellate review is hindered.

As this court observed in *State v. Gideon*, 257 Kan. 591, 609, 894 P.2d 850 (1995), nothing in the Kansas statutes requires the trial court to find the existence of mitigating circumstances beyond a reasonable doubt or to specify what mitigating circumstances are found. In *Gideon*, the trial court imposed a hard 40 sentence after finding the existence of three aggravating circumstances. Then, the trial court stated:

" 'The court further finds the following mitigating factors exist: First, the defendant has expressed remorse. Secondly, the defendant has accepted responsibility for his actions. And, thirdly, that the defendant eventually aided the authorities

in winding up the investigation and at least putting some finality to the acts that he committed.' " 257 Kan. at 610.

On appeal, Gideon pointed to evidence that supported mitigating factors other than the three mentioned by the trial court. The *Gideon* court noted that the trial court did not make any findings regarding the additional mitigating factors relied upon by the defendant. The defendant argued that the trial court erred in failing to state its findings and that the failure to state the other mitigating circumstances violated the Due Process Clause, the Eighth Amendment to the United States Constitution, Section 9 of the Kansas Constitution Bill of Rights, and the need for individual consideration during sentencing. 257 Kan. at 610.

The *Gideon* court pointed out that the trial court did not refuse to consider the proffered evidence in mitigation; instead, the court merely failed to indicate whether it found those three factors in mitigation. 257 Kan. at 611. This court determined that the defendant failed to show that the hard 40 sentence was imposed arbitrarily or in violation of his constitutional or statutory rights with respect to mitigating circumstances. The court stated: "Nothing in the hard 40 statutes requires the finder of fact to specify what mitigating factors are found; only aggravating factors must be designated." 257 Kan. at 611. It was ultimately held that, "[i]n light of the overwhelming evidence of aggravating circumstances, we cannot say that the court erred in failing to find and specify these three statutory mitigating factors on the record." 257 Kan. at 611.

Likewise, in *State v. Higgenbotham*, 264 Kan. 593, 957 P.2d 416 (1998), the defendant appealed his hard 40 sentence. The trial court based the imposition of the hard 40 sentence on two aggravating circumstances pursuant to K.S.A. 21-4636(e) and (f). Defense counsel argued that one mitigating circumstance applied: "The victim was a participant in or consented to the defendant's conduct." K.S.A. 21-4637(c). 264 Kan. at 610.

On appeal, this court determined that the two aggravating circumstances existed. As for the mitigating circumstance, this court stated: "The district judge made no finding that the mitigating factor of K.S.A. 21-4637(c) (victim consented to the defendant's con-

duct) existed. Thus, no mitigating factors are present." 264 Kan. at 612. The defendant's hard 40 sentence was upheld.

As in *Gideon*, the trial court in the present case did not refuse to consider the proffered mitigation arguments; the court merely failed to indicate whether or not it found those factors in mitigation. The hard 50 statutes do not require the sentencing court to make any findings on the record regarding the mitigating factors relied upon by a defendant. While it would have been a better practice for the trial court to make such findings at Jones' sentencing, it is not required and Jones fails to show that the hard 50 sentence was imposed arbitrarily or in violation of his constitutional rights. In light of the evidence supporting the aggravating circumstances, the trial court did not err in failing to make findings regarding Jones' proposed mitigating circumstances on the record.

### 6. *Cumulative Errors*

Finally, Jones contends that the previously discussed issues also constitute cumulative error. As previously observed, however, the trial court did not commit any errors with respect to those issues. Without error, there can be no cumulative error. *State v. Ross*, 280 Kan. 878, 888, 127 P.3d 249 (2006). Therefore, this issue has no merit.

Affirmed.

ALLEGRUCCI, J., not participating.
LOCKETT, J., Retired, assigned.