(264 P.3d 686)

No. 105,689

STATE OF KANSAS, *Appellant*, v. GARY E. WHITT, *Appellee*.

—

Opinion filed September 23, 2011.

*Erika N. Rasmussen* and *Steven J. Obermeier*, assistant district attorneys, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellant.

*Stacey L. Schlimmer*, of Schlimmer Law, LLC, of Olathe, for appellee.

Before PIERRON, P.J., MCANANY and STANDRIDGE, JJ.

PIERRON, J.: The State of Kansas appeals the district court's suppression of Gary E. Whitt's child-abuse confession. We reverse.

Ten-year-old K.T. was interviewed at the Sunflower House after claiming that Whitt, her great-uncle, had touched her "front" and "bottom." During her interview, K.T. said Whitt had "put his hand inside of her underpants" and " 'rubbed' " her vaginal area and buttocks. K.T. described at least two distinct incidents of touching.

Detective Matt Campbell contacted Whitt and asked him to come in to the police station for questioning. The next day, Whitt went to the police station to talk with Campbell.

Whitt and Campbell talked in an interview room for almost 2 hours. At the beginning of their conversation, Campbell told Whitt, "Before we begin, I do need to let you know that you're free to go. All right. You are not in custody . . . . This is strictly voluntary. Regardless of what we talk about today, you will not be arrested, anything like that." Campbell also said that if Whitt wanted to leave, he only had to "just say, 'Ready to leave.' We'll open the door and I'll walk you back down."

Whitt often answered Campbell's questions with rambling explanations. Whitt said he liked to tickle his nieces and nephews, but he was never inappropriate with them. Whitt called himself a

ray of sunshine who made the children happy. He called the children lost, troubled liars who lived in a "shit hole."

After 42 minutes of mostly Whitt talking, Campbell asked Whitt if he wanted anything, like a bathroom break or something to drink, and left the room. When Campbell returned, he repositioned his chair so it was in front of Whitt's. Before, the two men had been sitting on perpendicular sides of a table—now, they sat facing each other on the same side of the table.

After coming back into the room, Campbell said, "[T]he results of our investigation clearly show that there's some involvement there, between you and [K.T.]." Campbell then said he thought one of two things was possible—either Whitt was a sexual predator, or he had a moment of weakness and touched K.T. Campbell also told Whitt he did not think Whitt was the type of person who would set out to abuse a child. Campbell told Whitt he wanted Whitt to "say that it was a mistake, you know, just a momentary lapse in judgment."

Campbell repeatedly presented Whitt with the options of either admitting to being a child molester or a guy who made a mistake. Whitt eventually admitted to rubbing the girl's sides, back, and "bottom." Whitt went on to say he had a soothing, nurturing intent when he put his hands inside the child's underwear. He said there were times when his touching probably became inappropriate, but blamed it on the "massive hurts" he was facing from the deaths of his wife and mother.

After Whitt admitted touching the girl inappropriately, Campbell thanked Whitt for talking about it and left the room again. When he came back, Campbell said he wanted to "go back and kind of go step-by-step" over the incidents and get down to the "what and the how" of the touching. Whitt and Campbell talked some more, and the interview ended when Campbell escorted Whitt out of the room. Whitt was not arrested at the end of the interview.

Throughout the interview, Whitt was never restrained and never verbally or physically threatened. The two men remained civil and polite throughout the discussion. As the State points out, Whitt felt comfortable enough to call Campbell by his first name, and Camp-

bell told Whitt he could "sit and talk to you all day" compared to the other people Campbell had to deal with.

Whitt moved to suppress his statements to Campbell, claiming they were made involuntarily and in violation of his constitutional rights. The district court held a hearing and watched approximately 20 minutes of the 113 minute interview tape.

The district court granted Whitt's suppression motion. The court found that Whitt had been in custody during his interview with Campbell and should have been read his *Miranda* rights. The court also found that Whitt's statements were involuntary, mostly due to Campbell's use of questions that gave Whitt only two options—he was a child molester or a man who had made a mistake. The State timely filed this interlocutory appeal.

Whitt argues his confession was properly suppressed for two reasons: (1) It was obtained in violation of his *Miranda* rights and (2) the statements were involuntary. Each argument will be addressed in turn.

A dual standard is used when reviewing a district court's ruling on a motion to suppress a confession. The appellate court reviews the factual underpinnings of the decision under a substantial competent evidence standard. The ultimate legal conclusion drawn from those facts is reviewed de novo. The appellate court does not usually reweigh evidence, assess the credibility of the witnesses, or resolve conflicting evidence. *State v. Gant*, 288 Kan. 76, 80, 201 P.3d 673 (2009). Only when evidence is clearly incredible will a reviewing court reweigh evidence. See, *e.g.*, *State v. Matlock*, 233 Kan. 1, 3-4, 660 P.2d 945 (1983); *State v. Naramore*, 25 Kan. App. 2d 302, 321-22, 965 P.2d 211 (1998), *rev. denied* 266 Kan. 1114. Substantial evidence is evidence possessing both relevance and substance and which provides a substantial basis of fact from which the issues can reasonably be determined. Specifically, substantial evidence refers to legal and relevant evidence that a reasonable person could accept as being adequate to support a conclusion. *State v. Walker*, 283 Kan. 587, 594-95, 153 P.3d 1257 (2007).

Under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1965), pre-interrogation warnings are "required in the context of custodial interrogation given 'the compulsion inherent

in custodial surroundings.' 384 U.S. at 458." *Yarborough v. Alvarado,* 541 U.S. 652, 661, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004). Here, the district court ruled that Whitt's interview did not become custodial until about 1 hour into the discussion. At that point, according to the court, Campbell came back into the room "claiming to have evidence clearly showing [Whitt's] involvement in the crimes." Campbell said: "At this time, the results of our investigation clearly show that there's some involvement here, between you and [K.T.]" The court determined that Campbell's statement changed the interview "from benign to accusatory, which means that it turned from an investigatory interrogation to a custodial interrogation."

"Custodial interrogation has been described as the questioning (or its functional equivalent) of persons by law enforcement officers, initiated and conducted while such persons are held in legal custody or are otherwise deprived of their freedom of action in any significant way." *State v. Jones,* 283 Kan. 186, 194, 151 P.3d 22 (2007). Whether a person is in custody within the meaning of the Fourth Amendment depends upon the circumstances of the interrogation and whether a reasonable person would feel at liberty to terminate the encounter. Factors a court may consider in analyzing the circumstances of the interrogation include: (1) the place and time of the interrogation; (2) the duration of the interrogation; (3) the number of police officers present; (4) the conduct of the officers and the person subject to the interrogation; (5) the presence or absence of actual physical restraint or its functional equivalent, such as drawn firearms or a stationed guard; (6) whether the person is being questioned as a suspect or a witness; (7) whether the person being questioned was escorted by the police to the interrogation location or arrived under his or her own power; and (8) the result of the interrogation, for instance, whether the person was allowed to leave, was detained further, or was arrested after the interrogation. *State v. Morton,* 286 Kan. 632, 640, 186 P.3d 785 (2008). These factors, however, "are not to be applied mechanically or treated as if each factor bears equal weight." 286 Kan. at 640.

There is no "bright-line rule for determining when a person is in custody for purposes of whether *Miranda* warnings are required

before questioning." *State v. Vanek*, 39 Kan. App. 2d 529, 536, 180 P.3d 1087, *rev. denied* 286 Kan. 1185 (2008). Instead, the decision must be made on a case-by-case basis after looking at the totality of the circumstances. *Morton*, 286 Kan. at 642-43, 646-47.

Here, the district court noted that some of the facts showed the interview was merely investigatory: (1) the relatively short length of the interview and (2) that Whitt came and left the station on his own instead of being picked up by police. But the court pointed to three factors indicating that the discussion was a custodial interrogation: (1) the lack of *Miranda* warnings, (2) the physical characteristics of the interview room, and (3) Campbell's tactic of asking Whitt whether he was a sexual predator or just someone who had a momentary lapse in judgment. Each of the court's reasons will be addressed.

First, as the State points out, the presence or absence of a *Miranda* warning does not, in itself, aid the district court's determination as to whether this was a custodial interrogation. Giving or not giving *Miranda* warnings does not answer the question of whether an interrogation is custodial. *Miranda* warnings might be given in noncustodial situations, and they might not be given in custodial situations. In both cases, the warnings themselves do not classify the type of encounter.

The district court also noted there was only "one door [in the room] in front of which the questioning police officer stood." This is a slight misstatement of the facts, as shown by the video.

The district court is correct that the room does not have any windows and only one door. But Campbell did not stand in front of the door in the way the court seems to think. At the beginning of the interview, Campbell and Whitt were seated at perpendicular sides of a table. When Campbell reentered the room, he moved his chair around the corner of the table so he and Whitt are sitting on the same side, facing each other. Campbell did not stand and block the door, although he did admit his new chair position was "blocking [Whitt] from the door." As the State points out, Campbell sat through most of the interview, standing only to leave and reenter the room.

The room, according to Campbell, was just one of several interrogation rooms at the police station. If Whitt's confession could be suppressed based solely on the characteristics of this room, then it seems that all confessions obtained in interrogation rooms at the Olathe Police Station could be suppressed for the same reason. Further, Kansas courts have repeatedly found interviews can be noncustodial even though they were conducted at a police station. See *Morton*, 286 Kan. at 647.

The district court further found that Campbell's method of questioning made the interview custodial because Whitt only had two choices, "both of which, if admitted, would make [him] guilty." The court was correct: Campbell repeatedly brought up the issue of whether Whitt was a habitual predator or someone who had made a one-time mistake.

Campbell admitted the discussion had "moved from an interview to an interrogation" after he told Whitt there was evidence of "some involvement." Whitt was clearly being questioned as a suspect rather than a witness or informant. But whether Whitt was questioned as a witness or suspect is not determinative of the custody issue. See 286 Kan. at 641.

In *Morton*, there was "no dispute Agent Pontius considered [Morton] to be a suspect, not a witness." 286 Kan. at 641. The same is true here. Campbell clearly thought Whitt was a suspect, given the child's allegations. The *Morton* court held that the interview was not custodial based on several factors, including: (1) Morton drove herself to and from the interview, (2) Morton was not restrained in any way, and (3) Morton was told she could end the interview at any time. 286 Kan. at 646-47. Morton's interview, however, was conducted in a police station break room instead of an interview room. Given that Whitt was told he could leave at any time, the door was not guarded or locked, Whitt was not physically restrained, and Whitt had driven himself to the police station and was allowed to leave after the interview, we could find that, using an objective standard, a reasonable person would have felt he or she could leave at any time.

Here, there is some evidence to support the district court's conclusion that Whitt was in custody. Specifically, the location of ques-

tioning and the questions asked of Whitt point toward custodial interrogation. But we review the ultimate legal conclusion de novo.

In *Jones*, 283 Kan. at 201, the Kansas Supreme Court held that an interview was not custodial where (1) a person other than Jones was the focus of the investigation, (2) police told Jones he was free to leave, (3) he was never physically restrained, and (4) he was never threatened. Under subpoena, Jones accepted a ride to the police station from investigators. *Jones* differs from this case in that Whitt was, most assuredly, the focus of the criminal investigation at the time of the interview. But, like Jones, Whitt was told he was free to leave and was never restrained or physically threatened.

In *Morton*, the court summed up several other cases in which the interview was noncustodial, many of which have commonalities with Whitt's interview:

"*State v. James*, 276 Kan. 737[, 79 P.3d 169 (2003)] (interview noncustodial where defendant went to police station voluntarily, defendant was initially questioned as a witness, officer told defendant he was not under arrest, defendant not restrained, defendant had access to cell phone and pager, and defendant was arrested at end of interview on outstanding Missouri warrant); *State v. Jacques*, 270 Kan. 173, 186-87, 14 P.3d 409 (2000) (first interview at police station was noncustodial, defendant was free to go, interview took place in interview room, officers drove defendant to police station, defendant left freely after the interview, interview lasted over 2 hours, and the defendant was not a suspect); *State v. Heath*, 264 Kan. 557, 591, 957 P.2d 449 (1998) (as cited in *Jones*, 283 Kan. at 199) (interview was not custodial where defendant went to the police station voluntarily to be interviewed and waited unrestrained in waiting room prior to interview); *State v. Fritschen*, 247 Kan. [592, 604-05, 802 P.2d 558 (1990)] (interview noncustodial where defendant voluntarily went to police station to be interviewed, he was informed he was not under arrest and was free to leave, only two officers were present, officers did not yell at or threaten defendant, defendant was not hand-cuffed or restrained, officers started to take defendant home at one point, and the officers told defendant he could consult a lawyer and they would honor such a request)." 286 Kan. at 647.

Several of the factors in the cases cited in *Morton* are present in this case—Whitt was not restrained, threatened, or yelled at; the interview lasted less than 2 hours; only one officer was present; Whitt drove himself to and from the interview; and Whitt was told he was free to leave. In situations very similar to Whitt's, Kansas courts have found that the interviewee was not in custody. See,

*e.g.*, 286 Kan. at 647. Therefore, the district court's ultimate legal conclusion does not survive a de novo review because Whitt was not in custody.

Even though Whitt's interview was noncustodial, his statements "may nevertheless be inadmissible if they were obtained in violation of the due process voluntariness requirement." 286 Kan. at 649. Even if *Miranda* requirements are complied with, the court still must consider whether the confession was the product of Whitt's free and independent will. See 286 Kan. at 650. "When a defendant claims his or her confession was not voluntary, the prosecution has the burden of proving by a preponderance of the evidence that it was voluntary." *State v. Brown*, 286 Kan. 170, 172, 182 P.3d 1205 (2008).

We again look at the totality of the circumstances. See *Johnson*, 286 Kan. at 836. In particular, we must consider (1) Whitt's mental condition, (2) the manner and duration of the interrogation, (3) Whitt's ability to communicate with the outside world upon his request, (4) Whitt's age, intellect, and background, (5) the fairness of Campbell in conducting the interrogation, and (6) Whitt's English fluency. See *Morton*, 286 Kan. at 650. Again, we review the factual findings for substantial evidence and the ultimate legal conclusion de novo.

Several of those factors cut against the district court's finding that Whitt's statements were involuntary. First, Whitt is fluent in English. Whitt did not graduate high school, but he was a 57-year-old whose intelligence exceeded his educational level and whose mental condition was not at issue. Whitt did not ask to contact the outside world.

The district court noted that some circumstances "weighed heavily" in favor of involuntariness: (1) the physical characteristics of the interview room, (2) Campbell "claiming to have evidence of [Whitt's] involvement in the crimes that [Campbell] did not have," and (3) Campbell's tactic of questioning Whitt so that Whitt only had two options.

As for the characteristics of the interview room, the setting was not so overpowering as to render Whitt's confession involuntary, as discussed above.

As for Campbell's statement regarding evidence against Whitt, the district court seems to have misunderstood Campbell's statement. The court believed Campbell said he had evidence of Whitt's involvement that did not exist. Campbell said the "results of our investigation" showed there was something going on. This statement was based on the Sunflower House's interview with K.T., who said that Whitt had lifted up her shirt and put his hand inside of her underpants.

This was not a situation where Campbell claimed to have nonexistent forensic or physical evidence, as in *State v. Stone*, 291 Kan. 13, 237 P.3d 1229 (2010). During Stone's first interview with police, the interviewing officer repeatedly questioned Stone about how semen had ended up on the child's pajama top if there had been no sexual activity between the two. But police did not know when interviewing Stone if there was semen on the shirt, and later tests showed there was none. Nonetheless, the interviewing officer told Stone she knew "that when I match the DNA off the couch and off her shirt with the DNA from your mouth, it's all gonna match. All of it. Because she's telling me the truth." 291 Kan. at 27, 31.

Instead of lying to Whitt about nonexistent evidence, Campbell made an honest statement about the facts of the case—K.T.'s statements in her interview "clearly show[ed]" that Whitt had "some involvement" in her molestation. This truthful statement to Whitt is not a factor that should count toward involuntariness.

The only factor remaining is Campbell's questioning of Whitt— Campbell gave Whitt two choices, both of which meant he was guilty. A similar line of questioning was considered in *Stone*. In *Stone*, the officer repeatedly told Stone he had to admit what he did and tell the truth, and that everything hinged on how much he was " 'willing to be honest about.' " 291 Kan. at 28. According to the officer, Stone was either someone who was " 'tired, you're not feeling good, you made a bad choice, a bad judgment. Okay. Or are you this guy that's been preying on this little girl that took her and forced her to jack you off, because you're just a—a pedophile that preys on little girls?' " 291 Kan. at 31. The *Stone* court determined that statements like those "strongly suggested to Stone that

only confessing to the 'truth' as the detective saw it would save him from being painted as a 'preying pedophile' and, in truth, affect his sentence." 291 Kan. at 31.

The *Stone* court ultimately reversed the conviction, holding that Stone's confession was improperly admitted. The court said:

"While any one of the circumstances surrounding this interrogation, standing alone—Stone's [confused and tired] condition, Detective Mar's misleading statements about the semen on the pajama top, her statements that the length of his sentence could only be affected by his telling the 'truth,' the implications he would be viewed as a sexual predator unless he confessed—might not have led us to conclude Stone's statements were coerced, a review of the audio recording taking into account all of these circumstances, as the law requires, leads us to conclude as a matter of law that Stone's statements were not the product of his free and independent will and that it was error to admit them at trial." 291 Kan. at 32-33.

The only factor present in both *Stone* and this case is the tactic of only giving the defendant two options—to admit to being a sexual predator or admit that he had made a mistake. But in *Stone*, the court explicitly noted that just "one of the circumstances" might not be enough to find that the confession was involuntary. 291 Kan. at 32.

We also note the case of *State v. Swann*, No. 102,023, 2011 WL 1344728 (Kan. App. 2011) (unpublished opinion), which is factually similar to the case at bar. The *Swann* court found the interrogation to be lawful.

In this case, Whitt's free will does not seem to have been overborne by Campbell's questioning. Instead, Campbell's interrogation seems to have been fair and did not last an exceptionally long time. The district court erred in determining that Whitt's statements were made during a custodial interrogation and that they were involuntarily made.

Reversed and remanded for further proceedings.