Buser, J., dissenting:
I dissent from the majority's holding which affirms the district court's order suppressing P.W.G.'s incriminating admissions. In particular, I disagree with the legal conclusion by the district court and my colleagues that Detective Jeff Murphy conducted a custodial interrogation. In my opinion, the detective's questioning of P.W.G. was an investigative interview for which a valid waiver of Miranda rights was not required. Moreover, because Detective Murphy did not conduct a custodial interrogation, I would find that K.S.A. 2017 Supp. 38-2333(a) and (b) are not applicable to the facts and circumstances of this case. Accordingly, those provisions do not preclude admission of P.W.G.'s incriminating statements in evidence.
CUSTODIAL INTERROGATION
"A custodial interrogation is defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his or her freedom in any significant way." State v. Lewis , 299 Kan. 828, 834, 326 P.3d 387 (2014). In this case, it is undisputed that P.W.G. was not under arrest or in custody at the time of the interview. The question then becomes was he deprived of his freedom in any significant way? I agree with my colleagues that to analyze this question an appellate court looks to the eight factors most recently reprised in Lewis , 299 Kan. at 835, 326 P.3d 387.
In applying these eight factors to the circumstances of this case, I will analyze whether the district court's factual findings are supported by substantial competent evidence, and whether the district court's legal conclusion was correct-that a reasonable person would not have felt free to terminate the interrogation and leave. See State v. Warrior , 294 Kan. 484, 497, 277 P.3d 1111 (2012).
*176 1. The place and time of the interrogation.
With regard to this first factor, the district court simply found the "interrogation occurred at the police station." The district court considered this factor as indicative of a custodial interrogation. No finding was made as to the time of the interview, although it was uncontroverted that it occurred about 2:35 p.m. at the El Dorado Police Station.
The majority downplays the testimony that the interview was conducted in the "soft interview room." But the undisputed testimony was that the room was in an unsecured area of the police department, next to the municipal court clerk's office, and accessible to the public. This was a multi-purpose room used by law enforcement, in addition to victims, witnesses, and attorneys practicing in city court.
The room itself was described as having a window on one wall, a bookshelf on another, and a door with a window that allowed any occupant to see out into the public hallway. The room contained furniture, a drawing board, table, and several chairs. In fact, Detective *515 Murphy's testimony was that he specifically chose the soft interview room because of P.W.G.'s young age and it had more room to accommodate P.W.G.'s father.
While my colleagues cite Warrior , 294 Kan. 484, Syl. ¶ 4, 277 P.3d 1111, for the proposition that an interview at a police station "generally points to it being custodial," Op. at 508, in fact, Warrior teaches the converse: "Generally, other things being equal, a person questioned in familiar, or at least neutral, surroundings does not face the same pressures as one questioned in a police-dominated atmosphere and this factor weights against a conclusion that an interview was custodial." 294 Kan. 484, Syl. ¶ 4, 277 P.3d 1111. Kansas caselaw is replete with cases wherein an interview at a police station was found to be noncustodial. See State v. Morton , 286 Kan. 632, 647, 186 P.3d 785 (2008) (listing cases).
I believe the circumstances surrounding the soft interview room and the mid-afternoon time of the interview favor a finding that the interview was noncustodial.
*177 2. The duration of the interrogation.
The district court found the one-hour length of the interview was "not overly long, but it's certainly not short." Although it is undisputed that the interview lasted about an hour, there is disagreement regarding when, during the interview, P.W.G. made incriminating statements about the sexual touching between him and his six-year-old half-brother, E.G. According to the district court, P.W.G. gave incriminating answers about 45 minutes into the interview. On appeal, P.W.G. adopts the district court's estimate. For its part, the majority states that 28 minutes into the interview "P.W.G. disclosed that E.G. had tried to touch him while they were in bed together, but he told E.G. to stop. ... At about 37 minutes into the interrogation, P.W.G. admitted that he had asked E.G. to touch his penis in the bathtub because he wondered how it felt." Op. at 506. Substantial competent evidence does not support the time estimates of P.W.G.'s admissions as determined by the district court.
Based on my review of the times memorialized on the video recording, corroborated by independent timing, P.W.G. first admitted to the sexual touching in the bedroom and bathtub about 28 minutes after the interview began. About 34 minutes into the interview, P.W.G. said that he participated in the mutual touching because he was just "wondering" about it; and about 37 minutes into the interview, P.W.G. told Detective Murphy that the younger brother's touching of his penis "felt weird" and it "got hard." Also at this time, P.W.G. said he told his younger brother to "stop doing it" because he "didn't think it was right." Later in the interview, P.W.G. added additional details. In summary, based on the confirmed times shown on the video recording, the substantial competent evidence proves: P.W.G. initially confessed to the sexual crimes only 28 to 37 minutes into the interview.
Ultimately, the district court concluded that this second factor is "not really determining one way or the other." For its part, the majority states: "The duration of the interrogation is not necessarily determinative of whether it was custodial." Op. at 509. I disagree.
Given that P.W.G. admitted to the sexual crimes only 28 to 37 *178 minutes after the beginning of the interview, I believe this factor favors a finding that, due to its short duration, the interview was noncustodial. See State v. Deal , 271 Kan. 483, 498-99, 23 P.3d 840 (2001) [ (Court found noncustodial interview when defendant questioned at the police station for about three hours.) ], overruled on other grounds by State v. Davis , 283 Kan. 569, 158 P.3d 317 (2006) ; State v. Jacques , 270 Kan. 173, 186-87, 14 P.3d 409 (2000) (Court found noncustodial interview when defendant taken to police station and interviewed for about two-and-a-half hours.).
3. The number of police officers present.
It is uncontroverted that only Detective Murphy was present at the interview. This third factor caused the district court to observe that it "would point towards noncustodial." My colleagues do not mention this factor as necessarily indicative of either a *516 voluntary interview or custodial interrogation.
I agree with the district court that applying the third factor to this case tends to show that Detective Murphy was conducting a noncustodial interview.
4. The conduct of the officers and the person subject to the interrogation.
The district court determined that this fourth factor favored a finding that the interview was custodial. Importantly, however, the district court focused on only one aspect of Detective Murphy's conduct: Miranda warnings were given. As the district judge explained:
"Well, the Miranda was given which points towards this being custodial and in a way this is, I think, kind of a damned if you do, damned if you don't factor. If it's determined to be custodial and you didn't give it, then you have a problem. If you give it, it makes it seem much more custodial."
My colleagues do not address the district court's legal contention that a law enforcement officer's recitation of Miranda rights necessarily shows that whatever subsequent questions are posed are necessarily a product of a custodial interrogation. In fact, this is a misstatement of law. As our court indicated in State v. Whitt , 46 Kan. App. 2d 570, 574, 264 P.3d 686 (2011) :
*179 "[T]he presence or absence of a Miranda warning does not, in itself, aid the district court's determination as to whether this was a custodial interrogation. Giving or not giving Miranda warnings does not answer the question of whether an interrogation is custodial. Miranda warnings might be given in noncustodial situations, and they might not be given in custodial situations. In both cases, the warnings themselves do not classify the type of encounter."
Although the district judge did not otherwise address Detective Murphy's conduct during the interview relative to this factor, the judge later provided findings emphasizing the fair-minded manner in which Detective Murphy presented Miranda warnings to P.W.G. and his father. In my view, these findings should also have been considered in the totality of circumstances to show the fairness of Detective Murphy's interview:
"[S]o then the next issue, I think, is was there an adequate presentation by the detective of the Miranda warning. Well, I think the taped interview is very important here in making this determination. Rather than just reading what took place, the Court was able to see and hear. You know, the detective took considerable time in explaining each one of the rights, paused after reading each one, gave [P.W.G.] and his father time to talk. Now, it seems they didn't talk, but the detective did give plenty of time for a discussion had they wanted it, and he asked them many times if either one of them had questions, if they understood. He asked-he said many times you don't have to talk, you're free to leave. ... And I believe that the detective's presentation in this case was appropriate and adequate and gave an opportunity for there to be questions or explanation if necessary."
My colleagues acknowledge the State's argument that "Sergeant Murphy did not raise his voice; that [Father] was present with P.W.G. during the interrogation; and that there is no evidence that either [Father] or P.W.G. suffered from any mental, intellectual, or emotional problems that might have affected their perception of whether they could terminate the questioning." Op. at 509. But the majority concludes that Detective Murphy's comments and questions during the interview show that he was questioning P.W.G. as a suspect. Op. at 509-10. This factor is separately addressed later.
The video recording convinces me that Detective Murphy conducted the interview in a polite, respectful, and informal manner. He was soft-spoken and easy-going. During the interview Detective Murphy did not threaten or intimidate P.W.G. or his father. Rather, *180 the detective persuaded P.W.G. to tell the truth by emphasizing that he understood that P.W.G. "was a kid" and that neither he nor his father or mother were "mad at you" or believed that P.W.G. was "a bad person." Detective Murphy emphasized that E.G. was not hurt as a result of the touching. The *517 detective told P.W.G., "My biggest concern is you." In short, Detective Murphy's questioning was low-key, fair, and affirming towards P.W.G.
Additionally, Detective Murphy allowed P.W.G.'s father to interrupt with questions or comments to P.W.G. or the detective. P.W.G. was attentive during the interview and, although reluctant on occasion to answer certain questions, responded appropriately to the detective's inquiries. P.W.G. was polite and respectful to Detective Murphy and his father. P.W.G. did not raise his voice, become angry, or refuse to answer any questions. The only showing of emotion occurred about 38 minutes into the interview when, having admitted to his wrongdoing, P.W.G. wiped away some tears. During the break, about 40 minutes into the interview, Detective Murphy offered to get P.W.G. a soft drink or water, and then left the room for a few minutes which allowed P.W.G. and his father to converse alone. Finally, there is no evidence, or even an allegation, that the detective lied or deceived either P.W.G. or his father about the facts or evidence he had discovered during his investigation.
In summary, the district court erred as a matter of law in concluding that, because Miranda rights were given, the interview was necessarily custodial. On the contrary, substantial competent evidence supports the legal conclusion that Detective Murphy's conduct of the interview and P.W.G.'s behavior during the interview showed that it was noncustodial.
5. The presence or absence of actual physical restraint or its functional equivalent such as drawn firearms or a stationed guard.
With regard to the fifth factor, the district judge specifically considered:
"The presence of physical restraints such as weapons or something like that: No, there weren't. There was-it was in a room with-didn't have bars on the window, the door wasn't locked. Detective was in plain clothes, and according to what I could see in the video and the officer's testimony that he didn't believe there was a weapon showing."
*181 Moreover, there was no evidence that P.W.G. was restrained in any way or that a stationed guard was present. Importantly, the district court did not list this fifth factor as indicative of a custodial interview. My colleagues concede that "P.W.G. was never restrained, and it does not appear from the video that Sergeant Murphy was armed during the interrogation." Op. at 509.
I agree with the district court that applying this factor to the case facts suggests that the interview was not custodial.
6. Whether the person was being questioned as a suspect or a witness.
The district court found that P.W.G. was "being questioned as a suspect." The majority agrees with that finding. The video recording shows Detective Murphy telling P.W.G. and his father at the outset of the interview that, based on the information known to the detective, P.W.G. "can be considered a suspect."
I agree with the district court and my colleagues that at the time of the interview Detective Murphy considered P.W.G. a suspect in the sexual crimes reported by E.G. This sixth factor suggests the interview was custodial in nature. However, this particular factor is not determinative of the custodial interrogation issue. Whitt , 46 Kan. App. 2d at 575, 264 P.3d 686.
7. Whether the person being questioned was escorted by the police to the interrogation location or arrived under his or her own power.
In addressing this factor the district judge found, "Well, here his father brought him. Now, so really, [P.W.G.] was in someone's custody. It may not have been the custody of the police but the custody of his father .... So, you know, clearly I think he was in the custody of his father." (Emphasis added.) According to the district court, this seventh factor supported a finding of a custodial interrogation.
My colleagues also acknowledge that P.W.G. was not escorted by the police to the interview, but they assert he was not there of *518 his own free will because his father drove him to the police station. At the outset, as framed by our Supreme Court, this factor specifically relates to whether an individual is escorted by the police to the *182 interrogation location . The evidence is uncontroverted that P.W.G. was not transported by the police. The majority states a concern, however, that P.W.G. was not there "under his own free will," but that assertion is without any factual basis. Op. at 510. On the contrary, the district court found, "Now, in our case [Father] did not coerce, he didn't force and he didn't threaten [P.W.G.] in any way. He was completely reasonable." My review of the record reveals no evidence to suggest that P.W.G.'s father exercised any coercion or deprived P.W.G. of his freedom to choose whether he was agreeable to the interview. Moreover, that assertion is not relevant to this seventh factor.
There is substantial competent evidence to support the factual finding by the district court and the majority that the police did not escort P.W.G. to the police station. The legal conclusion by the district court and my colleagues that this factor weighs in favor of a custodial interrogation, therefore, is both factually and legally mistaken. Obviously, given his age, P.W.G. was not legally able to drive himself to the interview. The fact that P.W.G.'s father drove him to the interview-which is the typical way that 13-year-old children are transported to a destination-indicates that P.W.G. arrived "under his own power" and not by police escort. Applying the seventh factor to this case shows the interview was not custodial.
8. The result of the interrogation, for instance, whether the person was allowed to leave, was detained further, or was arrested after the interrogation.
With regard to this eighth factor, the district judge found that P.W.G.
"wasn't arrested, but it was really pretty clear to me during that interview that the detective had a plan that at some point [P.W.G.] was going to either be arrested or detained and charged because the detective said several times that he believed the six-year-old's account of what had happened."
Based on this finding, the district court found this factor indicated the interview was custodial because "the detective had a plan to arrest/charge the juvenile at some point after the interrogation." For their part, my colleagues do not address the district court's findings *183 but simply concede that P.W.G. "was not arrested or detained afterwards." Op. at 510.
My review of the record finds no evidence to support the district court's factual finding that Detective Murphy had a plan to detain or arrest P.W.G. after the interrogation, or at any time for that matter. On the other hand, the evidence is to the contrary. Detective Murphy advised P.W.G. and his father that they could leave the interview room at any time, and at the conclusion of the interview the detective was going to complete a report. Even the district court conceded the "detective said several times that there was not going to be an arrest." In fact, at the conclusion of the interview, P.W.G. was not detained further, was allowed to leave, and was not arrested. Moreover, P.W.G. was never arrested, but weeks later received a summons and complaint in the mail requesting his appearance in juvenile court.
Based on the record evidence I agree with my colleagues that there was substantial competent evidence that P.W.G. was not delayed, detained, or arrested following the interview. The district court's legal conclusion, which was not predicated on any evidence presented during the suppression hearing, is in error. Applying the eighth factor to this case shows the interview was not custodial.
CONCLUSION
In summary, I agree with the district court and my colleagues that at the time of the interview P.W.G. was a suspect. I also agree with the district court that because only one officer interviewed P.W.G. and the juvenile was not restrained, these two factors favor a finding of a noncustodial interview. I believe the district court's legal conclusion that because Detective Murphy provided P.W.G. with Miranda warnings that the interview was necessarily custodial is an error of law.
*519 Similarly, I find the legal conclusion by the district court and my colleagues that because P.W.G. was driven to the interview by his father that it was the equivalent to being escorted by the police was legal error. I also find no substantial competent evidence or legal basis to support the district court's finding that Detective Murphy had a plan to detain or arrest P.W.G. after the interview.
*184 On the other hand, having independently considered the eight factors relevant to this issue, as discussed earlier, I would conclude that seven of the factors favor a finding of a noncustodial interview and one factor suggests a finding of a custodial interrogation. Having considered the totality of the circumstances in this case involving the 13-year-old juvenile, I am convinced that a reasonable person of the same or similar age would have felt free to terminate the interview and leave. See Warrior , 294 Kan. at 497, 277 P.3d 1111.
Although my colleagues concede that with regard to the custodial interrogation question this is "a close case," I disagree. Op. at 510. The district court supported its suppression ruling by making several mistaken factual findings and erroneous legal conclusions. Correctly applying the eight factors to the proven facts and circumstances regarding Detective Murphy's questioning of P.W.G. convinces me that the interview was noncustodial. Moreover, because the interview was noncustodial-although Miranda warnings were provided to the juvenile and his father, both of them waived the Miranda rights, and P.W.G. agreed to talk with the detective-this procedure was not required by the Fifth Amendment or K.S.A. 2017 Supp. 38-2333(a) or (b). Accordingly, I would reverse the district court's order suppressing P.W.G.'s admissions and remand for further proceedings.