NOT DESIGNATED FOR PUBLICATION

No. 116,235

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MARCOS SILVA TEIXEIRA,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; THOMAS KELLY RYAN, judge. Opinion filed August 3, 2018. Affirmed.

*Carol Longenecker Schmidt*, of Kansas Appellate Defender Office, for appellant.

*Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before HILL, P.J., PIERRON and MALONE, JJ.

PER CURIAM: A jury convicted Marcos Silva Teixeira of rape, aggravated indecent liberties with a child, and aggravated criminal sodomy. Teixeira appeals, arguing the district court erred in denying his motion to suppress and by instructing the jury against nullification.

Teixeira's convictions arose out of an incident that occurred when Teixeira and the victim, J.W., spent the night at a mutual friend's home. Teixeira, a native of Brazil, was

1

30 years old at the time of the incident and had been living in the United States for about 8 years.

In August 2013, Brooke Beichley was going to have a birthday party for her six-year-old daughter. J.W., who was 14 years old at the time, was close with Beichley's daughter. She was also friends with Beichley and Beichley's former roommate, Amber Koch. Beichley invited J.W. over the night before the party to help set up. Afterwards, J.W. planned to spend the night at Beichley's apartment in Olathe.

J.W.'s mother, W.C., dropped off J.W. at Beichley's friend's house the night before the party. Beichley, her daughter, and Koch were there when J.W. arrived. Several men, including Teixeira, and several children were also at the house.

Beichley testified that J.W. had acted inappropriately at her friend's house that night. She was wearing "very short shorts and was doing cartwheels and flips in the living room" while in the presence of the men. J.W. was also flipping through channels with the remote control and came across a pornography channel. She began giggling and would not change the channel for a minute or two.

Around 2 a.m., a group of people went to Beichley's apartment. This group included J.W., Beichley, Teixeira, and Koch. A couple of hours later, everyone started going to sleep. Beichley suggested that J.W. sleep in her bed with her and Teixeira, with Beichley sleeping between the two. Beichley seemed drunk to J.W., but Beichley later denied she had been drinking.

J.W. testified she later awoke to Teixeira touching her breasts under her clothes. She told him, "Stop, I'm too young," at least three or four times, "pretty loud." He told her, "No, you're not," and she responded, "Yes, I am. I'm 14." J.W. said Beichley woke up and asked what was going on, and J.W. told her, "You know exactly what's going on."

2

Beichley went back to sleep. J.W. admitted at trial that in previous testimony she had said she had not said anything to Beichley.

Beichley said she was sleeping with Teixeira's left arm around her, and she woke up when she felt it moving. She heard J.W. saying "Stop, stop." Beichley asked what was going on. When no one responded, she went back to sleep.

J.W. testified she was afraid, but Teixeira had stopped so she just tried to go back to sleep. After finally falling asleep again, she awoke to Teixeira touching her vaginal area, and she started screaming. Teixeira put his finger in her vagina. She turned away from him, and he put his finger in her anus.

J.W. said she got out of the bed and went into the bathroom. As she went to shut the door, Teixeira stopped it. He leaned in and kissed her on the lips. He told her, "I'm so sorry, baby, you're beautiful. I'm sorry." Beichley said she woke up again when J.W. got out of the bed. Because J.W. eventually came back, she thought she had just gone to the bathroom.

Koch testified she slept on the couch in the living room that night. The door to the bedroom where J.W., Teixeira, and Beichley were sleeping was open. Koch said she would have awakened if she had heard something, and she did not wake up.

According to J.W., Teixeira went to the living room right after their conversation in the bathroom, and J.W. woke everyone up. She told Beichley and Koch what had happened. Beichley and Koch did not want to call W.C. because they thought they would be blamed for the incident. J.W. did not want to tell W.C. either, because she thought Beichley and Koch might get in trouble.

3

Beichley testified that while she was making breakfast, J.W. told her that Teixeira had touched her breasts and buttocks. Koch testified that J.W. was upset that morning and said that Teixeira had touched her breasts and vaginal area over her clothing. When Koch asked, J.W. denied that Teixeira had penetrated her. When Beichley asked if they should call W.C., J.W. said she did not want them to tell W.C. because she would "blow it out of proportion." J.W. also said she was afraid W.C. would be mad at Beichley and Koch.

Beichley confronted Teixeira that morning about J.W.'s claims, but he denied them. She testified that Teixeira later admitted to her that he had touched J.W. and he kissed her in the bathroom. However, she could not remember when he told her this.

After the party, W.C. noticed a dramatic change in J.W.'s behavior. She normally spent a lot of time with W.C., but she began secluding herself and crying. Several weeks later, J.W. told W.C. that a man had touched her the night she had slept over at Beichley's apartment. W.C. said J.W. told her the man touched her breast and then put his fingers in her vagina and anus while she was screaming and trying to get away. W.C. immediately reported the incident to the police.

J.W. testified she did not tell W.C. for a long time because she knew it would hurt her. She also thought W.C. would not let her see Beichley and Koch anymore. Eventually, though, she told W.C. because she needed to get help.

Detective Kenton Thompson of the Olathe Police Department investigated J.W.'s case. He arranged for someone from Sunflower House, a child advocacy center, to interview J.W. He also interviewed W.C., Beichley, and Koch. Eventually, Thompson called Teixeira to set up a time to talk, and Teixeira agreed to meet him.

Detective Thompson testified that he and Teixeira made plans to meet at the police station, but they had to change those plans because Teixeira did not have transportation.

4

Detective Thompson and his partner met Teixeira at Teixeira's friend's house in Olathe. Thompson and his partner were wearing street clothes. They both had weapons on them, but he could not remember if they were exposed.

Teixeira invited Detective Thompson and his partner into his friend's home, and they spoke briefly. Thompson asked if Teixeira would ride down to the police station with them. Thompson told Teixeira he would give him a ride to the police station and take him home, and Teixeira agreed to go. Before getting in Thompson's unmarked police car, Thompson patted down Teixeira. Teixeira rode in the front passenger seat on the way to the station. Teixeira was not in handcuffs.

Once at the police station, Detective Thompson and his partner took Teixeira through two secured doors and placed him in an interview room. The door to the interview room was not secured. Thompson offered Teixeira something to drink and left Teixeira alone in the room for a few minutes. Teixeira took out his cellphone and began using it while he waited for Thompson to return. Teixeira kept his cellphone on the table throughout the interview.

When Detective Thompson returned, he sat in the chair closest to the door. He told Teixeira the interview room had a video recorder. He also told Teixeira that he was there voluntarily, he was not under arrest, and he was free to go. Thompson said he would take Teixeira wherever he needed to go when they finished. Thompson gave no *Miranda* warning before he began questioning Teixeira.

Teixeira stated he had slept in the bed with Beichley and J.W. but nothing happened. Detective Thompson asked if Teixeira knew why he was there. Teixeira responded that Beichley said he had touched J.W. For the first half of the interview, Teixeira denied he had any inappropriate contact with J.W., but he also said several times that there had been an opportunity for "something to happen."

5

Detective Thompson asked Teixeira for a DNA sample, explaining it was routine in these kinds of cases. Because Teixeira read English only "a little bit," Thompson read the consent to search form out loud. Teixeira told Thompson he understood and signed the form. Thompson then took a buccal swab.

Detective Thompson told Teixeira that he was sure something had happened that night. Thompson said that he knew Teixeira did not have sex with or rape J.W., and rape was not the charge. Instead, Thompson suggested that Teixeira and J.W. had been touching each other. He told Teixeira that if the two had been touching each other, "there can be some understanding." But if Teixeira continued to deny anything happened and Thompson could prove something did happen, it would mean Teixeira had forced himself on J.W.

Teixeira asked what J.W.'s allegations were. Detective Thompson said she had accused him of touching her breasts, buttocks, vagina, and kissing her in the bathroom. Teixeira denied touching J.W., other than hugging her in the bathroom the next morning. He then told Thompson, "I lied. I touched her boobs. I didn't touch her ass. I didn't touch her vagina. And that's it. I touched her boobs."

Detective Thompson told Teixeira that he had the shorts J.W. had been wearing that night, and he was going to find Teixeira's DNA on them because Teixeira had put his hands down her shorts. Thompson testified at trial that he knew J.W.'s shorts had been washed, and he would not find DNA on them. Teixeira then admitted to touching J.W.'s buttocks but could not remember if he touched her over or under her shorts. He denied putting his finger in her anus. He also told Thompson he had hugged J.W. the next morning, kissed her on the forehead, and apologized for what happened the night before.

Detective Thompson told Teixeira that J.W. had said he put his finger in her vagina and anus. Teixeira eventually said he may have touched her vagina. He also said his finger could have gone inside her vagina, but he did not think that had happened.

Teixeira told Thompson he believed J.W. was okay with what happened. He admitted he had told Beichley what happened, but he also told Beichley that she was partly responsible because of the way she and J.W. had been acting that night. He mentioned that J.W. had temporarily changed the station to a pornographic channel and had also been doing cheerleading activities like stretching in front of him. That night, while all three of them were in bed, Beichley had given J.W. a back massage and told J.W. to take off her bra before going to sleep. According to Teixeira, "[T]hat excites any man."

The time stamp on the video shows the interview lasted about an hour and 40 minutes. Detective Thompson testified he had no problems communicating with Teixeira, and he only needed to clarify something he said once to make sure Teixeira understood. Thompson later testified at trial that Teixeira told him his native language was Portuguese. Thompson offered an interpreter, but Teixeira said he could understand Thompson and they could speak English. At the end of the interview, Thompson took Teixeira back to his friend's house.

In his brief, Teixeira says that Thompson did not tell him he was not under arrest and the interrogation lasted 40 minutes. The video shows that neither of these statements is true. Teixeira does not seem to be arguing that the district court made erroneous fact-findings, though.

The State charged Teixeira with one count of rape, a severity level one person felony, one count of aggravated indecent liberties with a child, a severity level 4 person felony, and one count of aggravated criminal sodomy, a severity level one person felony.

7

Teixeira moved to suppress the statements he had made to Thompson, arguing they were involuntary. The State responded that Teixeira's statements were voluntary. It also argued that he was not in custody so Thompson did not have to give him a *Miranda* warning.

After hearing testimony from Detective Thompson and watching the video of the interrogation, the district court denied Teixeira's motion. The court found (1) the police had escorted Teixeira to the police station; (2) they did not handcuff him; (3) Thompson told Teixeira it was a voluntary matter, he was not under arrest, and he was free to go; (4) Thompson allowed Teixeira to keep his cellphone; (5) the interrogation lasted about an hour and 40 minutes; (6) Thompson used interrogation techniques after Teixeira at first denied the allegations; and (7) Thompson and Teixeira had no problem communicating. The court found that, under the totality of the circumstances, a reasonable person would have felt free to leave. As a result, the court found Teixeira was not in custody and his statement was admissible even though Thompson had not given him a *Miranda* warning.

At trial, J.W., W.C., Beichley, Koch, and Thompson all testified for the State. The State submitted the video of Teixeira's statement and the video of J.W.'s Sunflower House interview. Teixeira objected to the admission of his interview with Thompson.

Teixeira testified that on the night of the incident, he fell asleep with his arm around Beichley. He woke up the next morning and went about his day. He denied touching J.W., other than putting his arm around her while she was brushing her teeth the next morning and asking her, "What's up?" He also denied telling Beichley that he had touched J.W.

Teixeira acknowledged he had admitted to touching J.W.'s breasts and buttocks during his interrogation. He explained he was scared after Thompson got his DNA. He testified that Thompson's angry attitude frightened him. He stated he thought, "[I]f I say I

8

touch her on top and on the side, I think it's not a big deal, you know. At least they're gonna say something, gonna let me go home or back to my work."

The jury convicted Teixeira on all counts. The district court sentenced him to a controlling term of 155 months in prison. Teixeira appeals. We affirm.

*Motion to Suppress*

Teixeira first argues the district court erred in denying his motion to suppress his statements. He contends he was in custody when Thompson interrogated him, but Thompson did not give him a *Miranda* warning before questioning. As a result, his statement was inadmissible, and the court erred in not suppressing it.

Teixeira contemporaneously objected to the admission of the video of his interrogation at trial, so he has properly preserved this issue for review. See *State v. Richard*, 300 Kan. 715, 726, 333 P.3d 179 (2014).

We use a dual standard when reviewing a district court's ruling on a motion to suppress a confession. We review the factual underpinnings of the decision using a substantial competent evidence standard. We then review the ultimate legal conclusion drawn from those facts de novo. We do not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence. *State v. Lewis*, 299 Kan. 828, 835, 326 P.3d 387 (2014).

The purpose of *Miranda* warnings is "to safeguard the Fifth Amendment privilege against self-incrimination by reducing the risk of a coerced confession." *State v. Morton*, 286 Kan. 632, 639, 186 P.3d 785 (2008). Law enforcement must give *Miranda* warnings to those who are in custody and subject to interrogation. *Lewis*, 299 Kan. at 834. A custodial interrogation, as opposed to an investigatory interrogation, is "questioning

9

initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his or her freedom in any significant way." 299 Kan. at 834. If law enforcement obtains incriminating statements from a suspect during a custodial interrogation without first providing a *Miranda* warning, those statements are generally inadmissible at trial. *State v. Schultz*, 289 Kan. 334, 342, 212 P.3d 150 (2009).

The parties do not dispute that Detective Thompson interrogated Teixeira. So the primary issue here is whether Teixeira was in custody. When determining whether someone is in custody, we ask two questions: (1) What were the circumstances surrounding the interrogation? and (2) Under the totality of the circumstances, would a reasonable person have felt free to end the interrogation and leave? See *State v. Warrior*, 294 Kan. 484, 497, 277 P.3d 1111 (2012).

Factors a court may consider in determining whether an interrogation was custodial include (1) the place and time of the interrogation; (2) the duration of the interrogation; (3) the number of police officers present; (4) the conduct of the officers and the person subject to the interrogation; (5) the presence or absence of actual physical restraint or its functional equivalent, such as drawn firearms or a stationed guard; (6) whether the person is being questioned as a suspect or a witness; (7) whether the person being questioned was escorted by the police to the interrogation location or arrived under his or her own power; and (8) the result of the interrogation, for instance, whether the person was allowed to leave, was detained further, or was arrested after the interrogation. No one factor outweighs another, nor do the factors bear equal weight. Courts must analyze each case on its own particular facts. *Lewis*, 299 Kan. at 835.

A review of these eight factors supports the district court's conclusion that Teixeira was not in custody and was not entitled to *Miranda* warnings.

10

*Time and Place*

Thompson interviewed Teixeira in an interview room at the police station. An interview that takes place in a police-dominated environment is more likely to be custodial. See *Warrior*, 294 Kan. at 497. So this factor would weigh in favor of finding Teixeira was in custody.

*Duration of Interrogation*

Teixeira's interrogation lasted about an hour and 40 minutes. While this is longer than some interrogations that have been found to be noncustodial, it is also shorter than others. See *State v. Bridges*, 297 Kan. 989, 1009, 306 P.3d 244 (2013) (finding 30 minute interview was "short" and did not suggest defendant was in custody); *State v. Deal*, 271 Kan. 483, 498-99, 23 P.3d 840 (2001) (finding defendant not in custody when interrogated for three hours at police station where other factors did not suggest he was detained), *overruled on other grounds by State v. Davis*, 283 Kan. 569, 158 P.3d 317 (2006). Thus, while the interrogation was not necessarily short, it also does not weigh heavily in favor of custody.

*The Number of Police Officers Present*

Two officers escorted Teixeira to the interview room, and one officer interrogated him. The presence of two officers does not influence the outcome one way or another. *Warrior*, 294 Kan. at 498. And the presence of one officer during the interrogation, at the very least, does not suggest Teixeira was in custody.

*Conduct of Officers and Person Interrogated*

Detective Thompson told Teixeira he was there voluntarily, he was not under arrest, and he was free to go. He also offered Teixeira something to drink and allowed Teixeira to keep his cellphone. The district court did find that Thompson had used interrogation techniques during the interview. While this may be relevant in determining whether Teixeira's statement was voluntary, it is not determinative of whether he was in custody. See, e.g., *Oregon v. Mathiason*, 429 U.S. 492, 495-96, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977) (holding officer's false statement that defendant's fingerprints were found at the scene not relevant to custody inquiry). This factor therefore suggests Teixeira was not in custody.

*Physical Restraint*

The police did not physically restrain Teixeira. Neither Detective Thompson nor his partner handcuffed Teixeira. While both officers had guns, they did not draw them. The door to the interview room was not secured, and Thompson told Teixeira he was free to go at any time. Teixeira points out that he had to go through two secured doors to get to the interview room, but the record does not show whether he would need assistance to exit through those same doors. This factor weighs against finding Teixeira was in custody.

*Whether the Person Was Questioned as a Suspect or a Witness*

The district court made no fact-finding for this factor, but Thompson testified that Teixeira was the only suspect when Thompson interviewed him. The parties agree that Thompson interviewed Teixeira as a suspect. While this may suggest Teixeira was in custody, "the fact a suspect is the focus of an investigation, standing alone, does not trigger the need for *Miranda* warnings." *Warrior*, 294 Kan. at 503.

12

*How the Person Arrived at Place of Interrogation*

Detective Thompson and his partner escorted Teixeira to the police station in an unmarked police car. Normally, this would lean toward finding a person was in custody. Here, however, Teixeira had originally made plans to meet Thompson at the police station. Those plans changed when Teixeira no longer had transportation. Thompson met Teixeira at a friend's house and then asked if Teixeira would be willing to go to the station. While Thompson patted down Teixeira before he got into the car, no one handcuffed Teixeira, and he rode in the front passenger seat.

*Aftermath of Interrogation*

Detective Thompson did not detain or arrest Teixeira at the end of the interrogation. This supports the conclusion that Teixeira was not in custody.

While some factors do weigh in favor of finding that Teixeira was in custody, under the totality of the circumstances, a reasonable person would have felt free to leave. Teixeira agreed to go to the police station and talk with Detective Thompson. No one restrained him, and he kept his cellphone on him. Thompson told Teixeira he was not under arrest and he was free to go. The interrogation lasted less than two hours, and Thompson allowed Teixeira to leave at the end. Teixeira thus was not in custody when Thompson interrogated him.

Although courts decide this issue case-by-case, caselaw also supports the conclusion that a reasonable person would have felt free to leave under these circumstances. See, e.g., *State v. James*, 276 Kan. 737, 752-53, 79 P.3d 169 (2003) (holding defendant not in custody when defendant went to police station voluntarily, officer first questioned him as witness, officer told defendant he was not under arrest and

13

did not restrain him, defendant had access to cellphone, and officer arrested defendant at end of interview on outstanding Missouri warrant); *State v. Jacques*, 270 Kan. 173, 186-87, 14 P.3d 409 (2000) (holding defendant not in custody during first interview at police station when officers drove defendant to station, interview took place in interview room, defendant was free to go and left after interview, interview lasted over two hours, and defendant was not a suspect); *State v. Whitt*, 46 Kan. App. 2d 570, 576-77, 264 P.3d 686 (2011) (holding defendant not in custody when defendant drove himself to police station, only one officer interviewed defendant, defendant was not restrained, officer told defendant he was free to leave, interview lasted less than two hours, and the officer did not arrest defendant at end of the interview).

Teixeira relies on *Morton* to support his argument that he was in custody. The *Morton* court found that even though Morton was a suspect, she was not in custody during her interrogation because a reasonable person would have felt free to leave. The court highlighted these facts:

> "Morton agreed to meet with Agent Pontius, and voluntarily drove herself to the police station to be interviewed. The interview took place in a break room; the room was not locked; and she was not handcuffed or restrained in any way. Agent Pontius told her she was not in custody; she could refuse to answer questions; and she was free to leave at any time. Morton was allowed to leave at the end of the interview." 286 Kan. at 646-47.

Teixeira tries to distinguish his situation from the one in *Morton* by pointing out: (1) two officers escorted him to the police station in a police car; (2) the interview took place in an interview room; (3) the officers escorted him through two secured doors to get to the interview room; (4) he could not immediately end his interaction with the police because Detective Thompson was his ride home; (5) Thompson did not say he was not under arrest, and a foreign national would not have felt free to leave simply because an officer said the interview was voluntary. Teixeira argues that these differences mean he was in custody unlike *Morton*.

14

For all the differences Teixeira can identify, though, there are also similarities between his case and *Morton*. For instance, Teixeira agreed to meet with Thompson. Teixeira was not handcuffed or restrained. Thompson told him he was free to leave, and Teixeira left at the end of the interview. Thus, looking at the totality of the circumstances, Teixeira's identified differences do not change the outcome of the custody analysis.

The only notable difference here is Teixeira's argument that Detective Thompson did not tell him he was not under arrest, and that as a foreign national, he would not have understood he was free to leave simply because Thompson said it was a voluntary matter. The first problem with this argument, though, is that Thompson *did* tell Teixeira he was not under arrest. He also told Teixeira he was free to leave. And while Teixeira was from Brazil, Thompson testified they could communicate in English, and Teixeira has raised no argument that he could not understand what Thompson was saying. Teixeira has provided no satisfactory reason for us to conclude that he did not understand he was free to leave despite the officer telling him so in a language he understood.

Based on the totality of the circumstances, Teixeira was not in custody when Detective Thompson interviewed him. Because Teixeira was not in custody, Thompson was not required to give him a *Miranda* warning and the district court did not err in denying Teixeira's motion to suppress. Teixeira's statement was properly admitted at trial and it is unnecessary to reach the harmlessness inquiry.

*Jury Nullification*

Teixeira also claims the district court erroneously instructed the jury against nullification. He finds error in Instruction No. 1 and Instruction No. 7. In Instruction No. 1, which comes directly from PIK Crim. 4th 50.040, the district court told the jury: "It is my duty to instruct you in the law that applies to this case, and *it is your duty to consider*

15

*and follow all of the instructions*. You *must* decide the case by *applying these instructions* to the facts as you find them." (Emphasis added.)

In Instruction No. 7, which comes directly from PIK Crim. 4th 51.010, the district court told the jury: "If you have no reasonable doubt as to the truth of any of the claims required to be proved by the State, *you should find the defendant guilty*." (Emphasis added.) Teixeira argues the emphasized language in these instructions discourages jury nullification.

Teixeira objected to Instruction No. 7 at the district court level, but he objected for a different reason than the one he raises on appeal. Teixeira asked the court to use the word "innocent" instead of "not guilty." As a result, the State contends Teixeira has not properly preserved this issue for appeal.

Teixeira concedes he did not properly preserve this issue, so we will not reverse the verdict unless he can show the giving of the instruction was clearly erroneous. See K.S.A. 2017 Supp. 22-3414(3); *State v. Pfannenstiel*, 302 Kan. 747, 752, 357 P.3d 877 (2015). In reviewing for clear error, we first consider whether the instruction was legally and factually appropriate, using an unlimited review of the entire record. *State v. Louis*, 305 Kan. 453, 457, 384 P.3d 1 (2016). If we determine the instruction was erroneous, it requires reversal if this court is firmly convinced the jury would have reached a different verdict without it. *State v. Cooper*, 303 Kan. 764, 771, 366 P.3d 232 (2016). In evaluating whether an instruction rises to the level of clear error, we conduct an unlimited review of the entire record. *State v. Betancourt*, 299 Kan. 131, 135, 322 P.3d 353 (2014).

Jury nullification is the inherent power of juries "to disregard the rules of law and evidence in order to acquit the defendant based upon the jurors' sympathies, notions of right and wrong, or a desire to send a message on some social issue." *State v. Allen*, 52 Kan. App. 2d 729, 734, 372 P.3d 432 (2016), *rev. denied* 306 Kan. 1320 (2017). Jury

16

nullification is always a possibility. *Silvers v. State*, 38 Kan. App. 2d 886, 890, 173 P.3d 1167 (2008). Even so, our Supreme Court has held that the district court must not instruct on jury nullification. *State v. McClanahan*, 212 Kan. 208, Syl. ¶¶ 3, 4, 510 P.2d 153 (1973). On the other hand, our Supreme Court has also held the district court may not instruct against nullification nor compel a jury to convict. *State v. Smith-Parker*, 301 Kan. 132, 164, 340 P.3d 485 (2014).

Teixeira relies on *Smith-Parker* to support his argument that these instructions discouraged jury nullification. The *Smith-Parker* court held that an instruction telling jurors "'[i]f you do not have a reasonable doubt . . . that the State has proven murder in the first degree. . . , then you *will* enter a verdict of guilty'" was clearly erroneous. 301 Kan. at 163-64. The court found that this use of "will" comes too close to directing a verdict for the State. 301 Kan. at 164. The court similarly disapproved of the word "must" in a reasonable doubt instruction. 301 Kan. at 164. Teixeira claims that much like the instruction in *Smith-Parker*, Instruction No. 1 and Instruction No. 7 compel a verdict for the State.

*Smith-Parker* is inapt in determining whether Instruction No. 1 is legally correct. The *Smith-Parker* court addressed an instruction telling a jury what to do once it has decided the State has met its burden of proof. In contrast, Instruction No. 1 tells the jury it must follow the instructions on the law in reaching that decision. And in telling the jury it must follow the law, Instruction No. 1 properly describes the jury's duty. As the *McClanahan* court held: "[I]t is the proper function and duty of a jury to accept the rules of law given to it in the instructions by the court, apply those rules of law in determining what facts are proven and render a verdict based thereon." 212 Kan. 208, Syl. ¶ 3; see also *State v. Amack*, No. 111,136, 2015 WL 2342371, at *5 (Kan. App. 2015) (unpublished opinion) (finding instruction telling jury to follow law consistent with *McClanahan*'s description of jury's function and duty).

17

Instruction No. 1 also accords with K.S.A. 2017 Supp. 22-3403(3), which states: "When the trial is to a jury, questions of law shall be decided by the court and issues of fact shall be determined by the jury." Likewise, it is consistent with K.S.A. 2017 Supp. 60-247(d), which states that "jurors must swear or affirm to try the case conscientiously and return a verdict according to the law and the evidence." See *State v. Swopes*, No. 115,181, 2017 WL 1035334, at *3 (Kan. App. 2017) (unpublished opinion) (finding instruction based on PIK Crim. 4th 50.040 described jury's duty consistent with K.S.A. 22-3403[3] and K.S.A. 60-247[d]); *Amack*, 2015 WL 2342371, at *5. As a result, the district court did not err in telling the jury it must follow the law as stated in the instructions.

While *Smith-Parker* is more relevant to Teixeira's challenge to the reasonable doubt instruction in Instruction No. 7, that challenge still fails. Many opinions of this court have found that use of the word "should" in the reasonable doubt instruction does not prohibit jury nullification. See, e.g., *Allen*, 52 Kan. App. 2d 729, Syl. ¶ 5; *State v. Singleton*, No. 112,997, 2016 WL 368083, at *4-5 (Kan. App. 2016) (unpublished opinion), *rev. denied* 305 Kan. 1257 (2016); *State v. Hastings*, No. 112,222, 2016 WL 852857, at *3-5 (Kan. App. 2016), *rev. denied* 306 Kan. 1324 (2017). In *Allen*, the court specifically distinguished *Smith-Parker*, explaining: "[u]nlike the words 'must,' 'shall,' and 'will,' the word 'should' does not express a mandatory, unyielding duty or obligation; instead, it merely denotes the proper course of action and encourages following the advised path." 52 Kan. App. 2d 729, Syl. ¶ 5.

Teixeira acknowledges *Allen*'s holding but argues it was wrongly decided. He claims no statute states that a jury should enter a guilty verdict if the State proves the charges beyond a reasonable doubt. Similarly, he contends no statute states "a jury 'must' apply the law and reach a verdict."

Contrary to this argument, K.S.A. 2017 Supp. 60-247(d) states that "jurors *must* swear or affirm to try the case conscientiously and *return a verdict according to the law and the evidence*." (Emphases added.) "While under the rubric of jury nullification jurors have the power to ignore the law and the evidence, doing so is a clear violation of their oaths as jurors." *State v. Cash*, No. 111,876, 2015 WL 5009649, at *4 (Kan. App. 2015) (unpublished opinion). And even without an applicable statute, these instructions would still accurately describe the function and duty of the jury as established by Kansas caselaw. See, e.g., *McClanahan*, 212 Kan. 208, Syl. ¶ 3; *State v. Bradford*, No. 115,008, 2016 WL 7429318, at *4 (Kan. App. 2016) (unpublished opinion) ("A jury's exercise of its collective power of nullification necessarily shreds its duty to follow the law, to fairly find the facts, and to render a 'true' verdict."), *rev. denied* 306 Kan. 1321 (2017).

Because Instructions No. 1 and No. 7 were both legally appropriate, we need not address Teixeira's reversibility argument. All the same, his argument lacks merit. To get a reversal of his convictions, Teixeira must firmly convince us that the jury would have reached a different verdict without these instructions. Teixeira's only argument on this point is that "[t]he evidence at trial largely presented . . . a credibility contest," and "[d]ue to the nature of the evidence . . . the jury would have reached a different verdict" without the district court's alleged errors. If the evidence could not support a conviction, though, the jury could have returned a not guilty verdict, and jury nullification would be a nonissue. Teixeira has failed to show that the district court committed clear error by giving either instruction.

Affirmed.